PUGET SOUND ENERGY, Inc.,
a Washington Corporation,
Petitioner,

v.

UNITED STATES of America; Administration, Bonneville Power Administration, Respondents.

No. 00–71276.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 10, 2002.

Filed Oct. 17, 2002.

614

Richard W. Oehler, Perkins Coie, Seattle, WA, for the petitioner.

Barry Bennett, Bonneville Power Administration, Portland, OR, for the respondents.

Before CYNTHIA HOLCOMB HALL, TASHIMA, and RAWLINSON, Circuit Judges.

## OPINION

CYNTHIA HOLCOMB HALL, Circuit Judge.

In this petition for review, we are asked to determine whether the Bonneville Power Administration (the "BPA") followed required procedure in making certain charges in association with sale of·the use of electric transmission lines to Petitioner Puget Sound Energy Inc. ("Puget Sound"). Before we may answer that question, however, we must determine whether the petition was brought within the statutory period for raising such challenges. In turn, answering this question requires us to consider the nature of the actions challenged by Puget Sound—whether the challenge is to a rate-making or the implementation of a rate—and the point in time at which any disputed action became "final." We hold that because the petition was brought more than 90 days after the disputed actions became final, we do not have jurisdiction to consider the substantive merits of the petition or grant Puget's request that the disputed charges be remanded to the BPA for additional administrative proceedings.

## I. Factual Background

The disputes in this case arise from a rather intricate transaction in which one party is a highly regulated federal entity and the other attempted to structure the transaction so as to evade part of the regulatory system. It is therefore necessary to discuss the factual history at some length.

### A. The Parties

Petitioner Puget Sound is a public utility providing energy to residential and business users in the Washington State area. The BPA is an agency of the United States established within the Department of Energy that markets hydroelectric power generated throughout the Pacific Northwest. For a detailed discussion of the history of the BPA, see *Puget Sound Power & Light Co. v. United States,* 23 Cl.Ct. 46, 48 (1991).

Actions of the BPA and its responsibilities as a federal power marketing agency are governed by a comprehensive statutory framework including the Northwest Power Planning and Conservation Act, 16 U.S.C. §§ 839–839h (the "Northwest Power Act," or the "Act"). *See also* 16 U.S.C. §§ 832–832l; 16 U.S.C. §§ 837–837h; 16 U.S.C. §§ 838–838k. While the BPA generally sells electric power, it sometimes also sells related transmission services to various other utilities. In doing so, the BPA is required to establish a rate for each type of transaction. 16 U.S.C. § 839e(a)(1). Rates must be developed in formal evidentiary hearings before a hearing officer. 16 U.S.C. § 839e(i). The BPA's Administrator is specifically required to, (1) publish notice of the proposed rate in the Federal Register with a statement of justification, (2) develop a full and complete record including public comments, (3) furnish an adequate opportunity for interested parties to cross-examine its witnesses and offer rebuttal to material it places in the record, and (4) issue a final decision which establishes rates based upon the record developed and includes a "full and complete justification." 16 U.S.C. §§ 839e(i)(1)-(5). Once the BPA issues a rate decision, it is then reviewed by the Federal Energy Regulatory Com-

mission (the "FERC"), and becomes effective upon interim or final approval. 16 U.S.C. §§ 839e(a)(2), (i)(6).

■ In addition, the Northwest Power Act creates a system of judicial review that is peculiar to the BPA. Section 9(e)(5) of the Act expressly provides that suits challenging a final action taken by the BPA under the Act or the implementation of such an action are subject to our exclusive jurisdiction. 16 U.S.C. § 839f(e)(5). Section 9(e)(5) of the Act reads in pertinent part:

> Suits to challenge the constitutionality of this chapter, or any action thereunder, final actions and decisions taken pursuant to this chapter by the Administrator or the Council, or the implementation of such final actions, whether brought pursuant to this chapter, the Bonneville Project Act [16 U.S.C. 832 et seq.], the Act of August 31, 1964 (16 U.S.C. §§ 837–837h), or the Federal Columbia River Transmission System Act (16 U.S.C. § 838 and following), shall be filed in the United States court of appeals for the region. Such suits shall be filed within ninety days of the time such action or decision is deemed final, or, if notice of the action is required by this chapter to be published in the Federal Register, within ninety days from such notice, or be barred .... Suits challenging any other actions under this chapter shall be filed in the appropriate court.

16 U.S.C. § 839f(e)(5). A rate determination is specifically enumerated as a "final action" taken pursuant to the Act, 16 U.S.C. § 839f(e)(1)(G), and it is "deemed final" upon confirmation and approval by the FERC. 16 U.S.C. § 839f(e)(4)(D). Thus, judicial review of disputes over a rate or the implementation of a rate are placed within our exclusive jurisdiction.

## B. The Transaction

The BPA is authorized to own and operate power transmission lines. One such set of lines is the Pacific Northwest–Pacific Southwest AC Intertie, a series of lines and facilities that link the Pacific Northwest to California. In 1984, the BPA was directed to participate in an upgrade project called the Third AC Intertie along with the Transmission Agency of Northern California ("TANC") and an Oregon utility called PacifiCorp. Pursuant to a request from the Chairman of the House Committee on Energy and Commerce, the BPA also developed a proposal for the participation of non-federal utilities through payment for part of the cost of the project in exchange for use of the lines to carry the purchasers' own electricity.

The BPA's initial proposal did not generate great enthusiasm among potentially interested buyers. Therefore, beginning in 1990, the BPA engaged in a series of negotiations with the eventual purchasers (the "Capacity Owners"), including Puget Sound, to determine the terms under which both sides would be willing to accept their participation. This resulted in a set of memoranda of understanding ("MOU's") signed in 1991. According to these MOU's, the BPA would reserve the first 800 MW increase in electric capacity from the Third AC Intertie for its own use, and sell its share of the second 800 MW increase (725 MW) to the Capacity Owners. Once the BPA established a formal rate, and upon execution of capacity ownership agreements with each of the Capacity Owners, the latter would make a lump-sum payment to the BPA based on the BPA's estimated cost of the facilities needed to produce the second 800 MW increase. After the Third AC Intertie began operation, this payment would then be adjusted to reflect the actual costs of construction, which the parties inelegantly refer to as a

"true-up to actuals." [1]

Subsequently, on August 25, 1992, the BPA began a formal rate-making proceeding (the "CO–94 Rate Case") pursuant to Section 7 of the Northwest Power Act, 16 U.S.C. §§ 839–839(h). Puget Sound participated in this process and did not object to the BPA's testimony or data during the hearings. On March 25, 1994, the BPA issued the final record of decision ("ROD") establishing the pricing methodology for calculating the lump-sum payment. This methodology was published in "Schedule CO–94" and in a separate cost estimate. The FERC granted final approval of the rate on June 20, 1994. *United States Dep't of Energy–Bonneville Power Admin.*, 61 FERC ¶ 61,351.

The pricing methodology set forth in Schedule CO–94 is fairly simple. It provides a basic formula for subtracting costs for the facilities needed for the capacity kept by the BPA from those which would supply capacity to the Capacity Owners, and for converting this number to a price calculated as dollars per kilowatt. The notes to this formula provide that the price would be based on "the construction costs (including direct, indirect, and overhead costs) of the facilities associated with the Third AC Intertie System Reinforcements and the Alvey–Meridian Transmission Line." The Alvey–Meridian Line is a line which was constructed by PacifiCorp, 50% of the capacity of which was acquired for the Third AC Intertie and paid for by BPA. The ROD also includes a list of facilities constructed as part of the Third AC Intertie and their allocation to the various parties.

Schedule CO–94 does not directly treat accounting issues related to cost allocation other than that direct, indirect, and overhead costs would be included in the price, and there is little discussion of such issues in general in the ROD. During the hearings, BPA witnesses testified somewhat cursorily that the estimated cost to the capacity owners, $215/kw, was determined by applying 1989 program planning estimates to the proposed pricing methodology. In addition, the ROD contains testimony that "the lump-sum payment would be adjusted to reflect the difference, in dollars per kilowatt, between estimated and actual costs (including BPA's normal allocation of corporate overhead and indirect expenses) of facilities [constructed for the project]." The notice of rate-making placed in the Federal Register to announce the CO–94 Rate Case also contains a statement that the BPA's "normal allocation of corporate overhead and indirect expenses" would apply.

Meanwhile, the Capacity Owners and BPA continued negotiating various details of the transaction and drafting the contract that ultimately incorporated Schedule CO–94. During these negotiations, one major issue was how to conduct the true-up to actuals for the ownership price. The BPA proposed that its calculations in performing the true-up to actuals should be checked and formalized through an additional rate-making proceeding. The Capacity Owners strenuously objected to this procedure and instead pressed Bonneville to agree to deal with the true-up to actuals through provisions in the final contract (the "Capacity Agreement") [2] giving the

---

**1.** Construction of the Third AC Intertie was substantially completed by the end of 1993, which is actually prior to the time at which Puget Sound made its initial lump-sum payment to the BPA. However, for reasons that are not made clear by the record, the actual

cost of construction of the project could not be fully calculated until approximately two years later.

**2.** Each of the Capacity Owners signed an individualized version of the Capacity Agree-

Capacity Owners the right to audit the BPA's books related to the costs of the project and refer any dispute to arbitration. As a result of their insistence, the BPA agreed to include an audit right in the Capacity Agreement as well as a limited right to non-binding arbitration. While Puget Sound claims that the parties also agreed to treat any unresolved cost disputes as a pure contract dispute rather than a dispute over a rate or the implementation of a rate for purposes of obtaining judicial review, the record does not indicate any such agreement. In fact, internal BPA documents show that it was concerned that agreeing to more than non-binding arbitration would render the contract illegal. Puget Sound and the BPA signed the Capacity Agreement, on October 11, 1994.

## C. The Price Dispute

In late 1995, the BPA calculated the true-up to actuals for the Capacity Owner's portion of the Third AC Intertie and, finding that the actual cost of construction was below the estimated cost, provided a refund of approximately $700,000 to Puget Sound. Later, on September 15, 1997, the Capacity Owners exercised their right under the Capacity Agreement to conduct an audit. They then submitted draft and final versions of their audit report requesting *inter alia* 1) a reimbursement of $14.5 million on overhead charges related to construction performed by PacifiCorp; and 2) a credit of $1.9 million for charges for spare parts that were capitalized rather than treated as a expense on an accruals basis.[3] While the BPA agreed to refund certain other expenses claimed in the re-

port, it denied any refund for these two expenses.

As to the overhead charge, Puget Sound objected to the BPA's allocation of part of its own cost of general overhead for the construction project to work performed by PacifiCorp on the Alvey–Meridian Line. Puget Sound claims before us that this charge reflects "double-counting" of the "fully-burdened" work performed by PacifiCorp because its audit showed that it already paid separate charges for PacifiCorp overhead related to this work as well as for support work done by the BPA. The BPA counters that its allocation of general overhead was consistent with the inclusion of indirect and overhead costs on the Alvey–Meridian line in Schedule CO–94 as well as the methodology used to produce the original price estimate, which was subject to scrutiny during the CO–94 Rate Case. It also contends that this was consistent with its "normal allocation" of overhead costs.

As to spare parts, the dispute is as to whether the parts in question can properly be capitalized as "emergency" spare parts that are of a unique and specialized nature, or whether they should be treated as inventory items like general spare parts. Claiming that the items are specialized spare parts that must be in place for use in an emergency, the BPA capitalized their cost, thus passing it on to Puget Sound and other Capacity Owners as part of construction costs. Puget Sound contends that the BPA has not established that the parts are unique items that must be in place for use in an emergency because it

---

ment reflecting use rights and payment obligations proportionate to its pro rata investment in the Third AC Intertie.

**3.** Due to the accounting treatment of these spare parts, they were charged to the Capaci-

ty Owners at the time of purchase (i.e. as part of the adjusted lump-sum payment) rather than at the time of use. Thus, the material dispute concerns the lost time-value of money from having to pay this price up front.

has inadequately documented the location and function of these parts.

## D.  Procedural History

Because there was no formal administrative proceeding connected to the true-up to actuals, the dispute over the overhead and spare parts charges was primarily conducted by private letters stating the parties' reciprocal positions. Puget Sound and the other Capacity Owners raised their demands for a refund in the draft version of their audit report and an accompanying letter which were sent to the BPA on January 16, 1998. The BPA replied on February 20, agreeing that it had mistakenly overcharged the Capacity Owners for some computer equipment but denying any overcharge related to spare parts or overhead. The BPA's response contained a detailed explanation of its cost charges and rebutted the specific allegations made in the audit report.

The Capacity Owners then sent a final version of the audit report on May 7, 1998 with an accompanying letter stating that they disagreed with the BPA's response, and repeating their demand for a refund. The BPA replied by letter dated June 4, 1998. The letter, signed by a senior account executive, stated in pertinent part:

> As a result of Bonneville's careful analysis of the Final Audit Report, Bonneville does not concur with Items 1 and 2 [overhead and spare parts] as discussed in the Final Audit Report .... If the Capacity Owners agree to resolve *all* of Item 3 [unrelated computer charges] by accepting Bonneville's offer of $7,971.48 plus associated overheads and AFUDC, Bonneville will refund such amount.

> Please advise in writing if the Capacity Owners accept such resolution.

The letter also contained a specific item by item response to the claims represented by the Capacity Owners stating the BPA's position in unconditional terms. The Capacity Owners did not directly respond to the BPA's rejection of their overhead and spare parts claims in this letter.[4]

Almost a year later, Puget Sound submitted a claim to the BPA for a refund under the Contract Disputes Act (the "CDA"), 41 U.S.C. §§ 601–613, styling its claim as one for breach of contract. The claim presented the same substantive issues with respect to overhead and spare parts that were presented in the final audit report, but differed in that it conformed to the formal requirements of the CDA.[5] Puget Sound requested an official response from the contracting officer of the BPA within 60 days either accepting or rejecting its claim. The BPA did not issue such a response. Instead, legal counsel for the BPA drafted a letter stating the BPA's position that the dispute was not subject to the CDA, but was instead a challenge to a final action and/or implementation of a final action taken pursuant to Section 7 of the Northwest Power Act. The letter, which was dated May 19, 1999, noted that suits challenging such actions must be brought directly to the Ninth Circuit within ninety days of the time that such actions are deemed final.

Puget Sound then filed a complaint for breach of contract in the United States Court of Federal Claims under the Tucker Act on July 1, 1999. The BPA filed a motion to dismiss the complaint on the ground that the Court of Federal Claims

---

4. The Capacity Owners apparently accepted the refund for computer charges.

5. Additionally, Puget Sound acted alone in presenting the CDA claim. The record does

not show whether any of the other Capacity Owners sought further recourse from the BPA after its response to the final audit report.

lacked jurisdiction. The Court agreed, finding that "Congress specifically intended in the Northwest Power Act to place review of final decisions by the BPA exclusively in the Ninth Circuit to avoid conflicting juridical interpretations among various federal courts." *Puget Sound Energy Inc. v. United States,* 47 Fed. Cl. 506, 511 (2000). The Court of Federal Claims held that under the "true nature" test, *see Pacific Power & Light Co. v. Bonneville Power Admin.,* 795 F.2d 810, 816 (9th Cir.1986), Puget Sound's complaint was a challenge to a rate-making and/or implementation of a rate which was within the exclusive jurisdiction of the Ninth Circuit regardless of the fact that Puget Sound characterized it as a claim sounding in contract. *Puget Sound Energy Inc.,* 47 Fed. Cl. at 509–12 (citation omitted). The court also noted that in four of what it considered the seven major relevant cases exploring the issue of jurisdiction, Puget Sound or a predecessor had been a plaintiff and had argued for contract based jurisdiction. *Id.* at 509–510; *See also, Puget Sound Power & Light Co. v. United States,* 23 Cl.Ct. 46 (1991); *CP Nat'l Corp. v. Jura,* 876 F.2d 745 (9th Cir.1989); *City of Seattle v. Johnson* 813 F.2d 1364 (9th Cir.1987); *Pacific Power,* 795 F.2d at 816. In all four, the relevant court ruled in favor of Ninth Circuit jurisdiction. It thus concluded that it was "more than passing strange" that Puget Sound was still attempting to litigate the jurisdictional issue. *Puget Sound Energy Inc.,* 47 Fed. Cl. at 511.

In lieu of dismissal, the Court of Claims transferred the case to the Ninth Circuit pursuant to 28 U.S.C. § 1631, commending to us the question whether Puget Sound's claim may be considered timely.[6] Pursuant to section 1631, the claim is considered filed in this circuit as of the date it was actually filed in the Court of Claims, July 1, 1999. *See* 28 U.S.C. § 1631.

## II. DISCUSSION

### A. Threshold Questions for Jurisdiction

As stated above, Section 9(e)(5) of the Northwest Power Act permits a party disputing a final action of the BPA to bring such a petition to the Ninth Circuit within ninety days of the date that such action is "deemed final." 16 U.S.C. § 839f(e)(5). In order to determine the timeliness of Puget Sound's petition in accordance with Section 9(e)(5), we must first determine the nature and timing of the actions that are being contested. If Puget Sound is simply contesting the substance or procedure of the CO–94 Rate Case, the ninety-day period for challenging that action had long elapsed before Puget Sound filed this petition because the CO–94 Rate Schedule was approved by the FERC in 1994. If, however, the question presented is a challenge to the implementation of the CO–94 rate during the true-up to actuals, then jurisdiction hinges on whether the claim was brought within ninety days of when such an implementation was properly deemed final. Alternatively, if it is the case that the challenge is to a rate established during the true-up to actuals in derogation of the requirements of Section 7(i), then there has been no final action which could create jurisdiction pursuant to the Act, but we might still have jurisdiction to hear the claim under the All Writs

---

6. Although a court must generally consider whether a claim "could have been brought" in another court before transferring it there, *see* 28 U.S.C. § 1631, in this case answering that question requires interpreting the North-west Power Act, a task which the act itself assigns to the Ninth Circuit. The Court of Claims therefore refrained from addressing the timeliness of Puget Sound's petition. *Id.* at 514.

Act, 28 U.S.C. § 1651, and our inherent power of mandamus to issue orders necessary to preserve our prospective jurisdiction. *See Pub. Util. Commiss'r v. BPA,* 767 F.2d 622 (9th Cir.1985).[7]

■ Looking directly to the substance of the claims raised by Puget Sound, we find that the dispute as to spare parts concerns a matter of implementation. In the original CO–94 rate-making, the rate for the Capacity Owners' section of the Third AC–Intertie was set at the cost of construction. While "cost" is admittedly a fairly thin specification of a rate which leaves much in the realm of applicable accounting potentially open to controversy, there is no such controversy on this part of the claim. Puget Sound does not challenge that it is a proper accounting of cost consistent with the rate established in the CO–94 rate proceeding to capitalize emergency spare parts of a unique nature, in other words to treat them as part of the lump-sum cost to the Capacity Owners. Nor does either party dispute that more common and fungible spare parts are properly treated as units of inventory that are expensed for accounting purposes and that would in this case be charged to Puget Sound through annual cost charges when used. Rather Puget Sound simply challenges the BPA's documentation of the fact that the particular spare parts at issue

in this case are actually emergency spare parts of a unique nature. This is a quintessential implementation issue similar in kind to a customer's claim that a power company has overstated the amount of power sold at peak hour rather than off-peak hour rates.

■ We also find that Puget Sound's challenge to the overhead charge assessed by the BPA during the true-up to actuals is a challenge to the implementation of the CO–94 rate. During the CO–94 rate proceeding, witnesses for the BPA testified that overhead would be allocated to the construction costs of the Third AC Intertie project according to its "normal allocation of corporate overhead." Puget Sound now claims that the BPA has not provided sufficient evidence that its "normal" practice includes charges of the type made to the capacity owners and points to various administrative documents purporting to show that this can not be proper. This claim would require us to compare the BPA's actual practice in calculating the cost to the Capacity Owners to a metric established in the CO–94 rate proceeding. As with the spare parts charge, this is a classic claim of improper implementation.

■ Alternatively, the dispute with regard to overhead could reasonably be characterized as a dispute over a rate set by the BPA either during the CO–94 Rate

7. We note that Puget Sound's petition is not particularly helpful in framing the nature of the actions it is challenging. In its briefs, Puget Sound does not attempt to identify the types of action it is disputing, nor does it set forth any explicit arguments to aid us in making such a consideration. Petitioner did assert during oral argument that it was challenging the BPA's implementation of a rate rather than a rate itself, a position which is not surprising given that it is too late to challenge the CO–94 Rate Case directly. However, Puget Sound also argues that the BPA's charges were unlawful because the BPA did not give the Capacity Owners ade-

quate notice during the CO–94 Rate Case that what it describes as "double overhead" or spare parts charges would be included in the purchase price for the Third AC Intertie; a claim that would appear to go to the adequacy of the rate proceeding itself as much as implementation of the established rate. Moreover, the only remedy that Puget Sound seeks is in the nature of a mandamus to compel a supplementary Section 7 proceeding, and such a proceeding is only required by the Northwest Power Act in connection with a rate determination rather than implementation of an existing rate.

Case or during the true-up to actuals. A rate is simply a "price stated or fixed for some commodity or service measured by a specific unit or standard." *See Cal. Energy Res. Conservation and Dev. Comm'n v. Bonneville Power Admin.*, 831 F.2d 1467, 1472 (9th Cir.1987) (citing *Black's Law Dictionary*, 1134 (5th ed.1979)). Unlike the issue with regard to spare parts, Puget Sound is in this case challenging an action that goes to an accounting question as to how exactly "cost" was to be calculated in setting the price to the capacity owners. Further, Puget challenges whether it was given adequate notice of how the BPA intended to treat overhead charges on work performed by its construction partners during the CO–94 Rate Case. While this challenge is in the first instance a challenge directly to the propriety of the CO–94 Rate Case itself, it also suggests the possibility that the charge for overhead during true-up to actuals could be an action in the nature of establishing a rate if it is in fact the case that the rate was not adequately established in the prior proceeding.

■ However, given the fact that the overhead dispute is also a matter of implementation, this alternative way of framing the matter does not ultimately change our jurisdictional analysis. First, as a challenge to the CO–94 Rate Case, Puget Sound's claim would be untimely. Second, we are not convinced given the specific facts of this case that Schedule CO–94 and the accompanying ROD were so inadequate as to require the finding that the true-up to actuals was itself a rate-making. As noted above, Schedule CO–94 and the attached documents unambiguously indicated that overhead costs attributable to the Alvey–Meridian line would be charged to the Capacity Owners. Testimony in the ROD states at several points that costs include the BPA's "normal allocation" of

corporate overhead and indirect expenses, indicating that the BPA would apply its standard accounting practices. The estimated price for the initial lump-sum payment for the Third AC Intertie also appears to have included this price as part of the application of planning estimates to the CO–94 methodology. Puget Sound, like the other Capacity Owners, had full opportunity during the CO–94 Rate Case to require further clarification on the BPA's standard accounting for construction costs. Particularly in light of the fact that Puget Sound was an active participant in negotiating the very transaction that the Schedule 94 Rate Case memorialized, we find that it was given sufficient notice of the price it was to be charged prior to the true-up to actuals.

■ Moreover, even if the true-up to actuals should properly be considered a rate-making, it would necessarily be non-final as such since the rate would have been made in derogation of the requirement to conduct a Section 7 proceeding. *See* 16 U.S.C. § 839e(i). Since the Northwest Power Act does not confer jurisdiction to consider such non-final actions, we would only have jurisdiction based on this theory of the claim in the extraordinary circumstance that it was necessary to issue a writ in the nature of a mandamus to compel a Section 7 proceeding pursuant to the All Writs Act in order to preserve our prospective jurisdiction. *See Pub. Util. Comm'r of Oregon*, 767 F.2d at 630. Since we may already exercise jurisdiction over the overhead claim as an implementation of an existing rate, it is not necessary to issue such a writ.

Thus, since 1) both of Puget Sound's substantive claims challenge the BPA's implementation of its rate for the Capacity Owner's portion of the Third AC Intertie in conducting the true-up to actuals, and 2) any claim challenging the CO–94 rate pro-

ceeding itself is clearly untimely; jurisdiction for either of Puget Sound's substantive claims depends on whether its July 1, 1999, claim was brought within ninety days of the time when consideration of claims related to the true-up to actuals became final. We now turn to that inquiry.

### B. Jurisdiction for Challenges to Implementation of the CO–94 Rate

■ Unsurprisingly, the parties dispute the date on which the BPA's implementation of the true-up to actuals became final. The BPA asserts that its implementation became final when it issued its June 4, 1998 letter responding to the Capacity Owners' final audit report. It argues that the letter was its final action because it included a comprehensive and unconditional denial of the Capacity Owners' claims without indicating that it would consider the issue further, and because the Capacity Owners had no right to demand further consideration under the Capacity Agreement. It further denies that its later March 24, 1999 letter responding to Puget Sound's demand for a refund under the Contract Disputes Act was the final action because that letter merely stated its position that the claim was not a contract claim to which the CDA applied.[8]

Puget Sound counters that the March 24, 1999 letter was the final action in this dispute because the earlier letter was too ambiguous to give sufficient notice that the BPA had made a final determination. It also claims that it reasonably believed that its dispute was properly considered a contract dispute over the sale of personal property, and that it therefore could repackage its demand to the BPA as a certified claim brought pursuant to the CDA and require it to consider that claim anew before seeking judicial review in the Court of Federal Claims.

■ Although Section 7 of the Northwest Power Act permits an aggrieved party to challenge the implementation of final actions in the Ninth Circuit, it does not provide any agency specific standard as to what constitutes "final" action in this context. In considering when the BPA's denial of the Capacity Owner's challenge to its calculation of the true-up to actuals purchase price became final, we therefore turn for guidance to the more general doctrine of finality in administrative agency law. Fundamentally, that doctrine, "is concerned with whether the initial decision-maker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." *Ma v. Reno*, 114 F.3d 128, 130 (9th Cir.1997) (quoting *Darby v. Cisneros*, 509 U.S. 137, 144, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993)); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) ("The core question is whether the agency has

---

8. By its terms, the CDA applies to "any express or implied contract ... entered into by an executive agency for—... (4) the disposal of personal property." 41 U.S.C. § 602. It specifies that all claims against the government "relating to a contract" shall be in writing and addressed to the "contracting officer," and that for claims over $100,000 the claimant or "contractor" "shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor be-

lieves the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor." 41 U.S.C. § 605(a), (c)(1). Once the contracting officer receives a claim conforming to the requirements of the CDA, he or she is required to issue a decision within sixty days, or if the claim is for more than $100,000, to notify the claimant within sixty days of when it will issue a decision. 41 U.S.C. § 605(c)(2). Once a decision becomes final, a contractor may bring an action challenging it to the Court of Federal Claims. 41 U.S.C. § 609.

completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."). Additionally, the Supreme Court has held in other contexts, as have we, that if an initial agency action may be modified or reversed during administrative reconsideration or review it is rendered non-final while such review is pending. *See I.C.C. v. Bhd. of Locomotive Engineers*, 482 U.S. 270, 284–85, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987); *Acura v. Reich*, 90 F.3d 1403, 1408–9 (9th Cir.1996). This rule is based on the consideration that it would waste scarce government resources to undertake parallel judicial review under such circumstances. *Acura*, 90 F.3d at 1407. The Supreme Court has similarly stated that, "the relevant considerations in determining finality are whether the process of administrative decision making has reached a stage where judicial review will not disrupt the orderly process of adjudication." *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970). Thus, in considering when the BPA's implementation of its rate in this case became final, we look for the date at which it communicated a definitive position that it would not grant a refund for spare parts or overhead and closed consideration of the issues.

Applying this practical test, we find that Puget Sound's petition was brought more than ninety days after the BPA's decision became final. Since federal law does not establish a formal procedure for the BPA to follow in implementing a rate, the parties themselves supplied a comprehensive and well-defined procedure for doing so in this case in the Capacity Agreement.

The Capacity Agreement specifies that the BPA was required to conduct the true-up to actuals and make any required price adjustment by distributing bills or refund vouchers to the Capacity Owners according to a specific timeline. According to Section 16 of the Capacity Agreement, once those vouchers were distributed, the Capacity Owners were permitted to perform a single audit of the BPA's books within 24 months. Once that audit was submitted to the BPA, Section 16 then required the BPA to respond within 30 days, either by agreeing with any exceptions claimed in the audit and remitting refund vouchers, or by disagreeing with such exceptions and proposing a resolution of the disagreement. If a committee representing all of the Capacity Owners agreed with the resolution, the BPA was required to remit refund vouchers for any additional refund proposed by it within the original 30–day period. If the committee did not agree, the Capacity Owners were then permitted to submit the dispute to non-binding arbitration pursuant to Sections 15 and 16 of the Capacity Agreement.

However, the right to arbitrate such as dispute was given to the representative committee only, not to the individual capacity owners, and it was of limited duration. If not exercised within eight months of the date that the audit began, the right was deemed waived.[9] At that point, the Capacity Agreement contemplated no further agency action, and the parties' only possible recourse was to the judicial system. On the other hand, if the Capacity Owners did submit a claim to nonbinding arbitration, the BPA was required to respond to the decision of the arbitrator within 90 days. Although the BPA could reject the decision of the arbitrator, it could only do so for a limited number of

---

**9.** The Capacity Agreement also specifically holds Puget Sound bound to any resolution of an audit dispute reached by the BPA and the committee representing the Capacity Owners as a whole.

reasons specified in the Capacity Agreement.

With this as background, it is clear that the BPA took the final action required of it according to the process contemplated by both the BPA and Puget Sound itself on June 4, 1998. On May 7, 1998, the Capacity Owners transmitted a letter to the BPA demanding a refund and accompanied by the "final" audit report covering the true-up to actuals. The BPA's response letter was issued within thirty days, as required by the Capacity Agreement. At that point, the BPA had completed the steps of the agreed decision-making process and the Capacity Owners could choose whether to accept or reject its resolutions of the dispute (including a small refund for computer equipment). The Capacity owners accepted the BPA's proposal as to computer equipment but failed to respond as to the issues currently under petition. Since the deadline for taking a dispute to arbitration had already passed on May 15, 1998, the only recourse left to them was judicial.

Moreover, the contents of the BPA's letter responding to the final audit report were consistent with the parties' understanding that the BPA's action was its final action consistent with the procedure set up in the Capacity Agreement. Although the letter did not explicitly state that it was the BPA's "final decision," it did contain an unambiguous and definitive rejection of the Capacity Owner's claims as to overhead and spare parts charges and denial of a refund. This was sufficient to inform the Capacity Owners that they had received the response to the audit required of the BPA. While the letter invited the Capacity Owners to contact a BPA official to answer any further questions regarding the response, and also asked them to inform it whether the committee accepted its resolution of the unrelated computer charge—as required by the Capacity Agreement before the BPA made any additional refund—it contained no indication that it would further consider the merits of the Capacity Owners' claims.

■ Further, we are not persuaded by Puget Sound's argument that its allegedly reasonable belief that the BPA was required to reconsider its true-up to actuals in response to a letter styled as a CDA claim is cause to consider May 19, 1999 the date at which implementation became final. As an initial matter, we note that Puget Sound's subjective belief is not apposite to the question of finality because our inquiry focuses on the point at which the BPA had taken a definitive position that was not actually subject to reconsideration and gave adequate notice of the fact to the Capacity Owners. *See Ma*, 114 F.3d at 130. Therefore, the question which Puget Sound properly raises centers on whether its belief was "reasonable" either because the BPA gave it cause to believe that it had not yet taken a definitive position or because the BPA was actually required to reconsider in response to a CDA claim. And the answer in both cases is no.

Puget Sound presents no evidence that the BPA had indicated willingness to undertake a redundant review of its claims after the process for finalizing the true-up to actuals contemplated in the Capacity Agreement was completed. Instead, Puget Sound contends that it reasonably came to the conclusion that the CDA applied to its claim. But mere reasonableness in this regard is of no avail because it is not apposite to the test outlined above. Even assuming that Puget Sound's legal conclusion was "reasonable" in the sense that it was colorable in light of prior case law, a mistaken legal belief that one can render an administrative decision non-final by requiring it to undertake additional adminis-

trative review is not apposite to the question whether the initial review was in fact final.

■ Finally, since Puget Sound presented a CDA claim for a refund of overhead and spare parts charges, we must determine whether the procedures and remedies provided by the CDA apply to Puget Sound's claims despite the fact that they challenge a rate implementation under our exclusive jurisdiction. We hold that they do not. In a variety of contexts, the Supreme Court has held that a remedy furnished by a precisely drawn and detailed statute preempts a more general remedy provided by statute. *See Brown v. GSA*, 425 U.S. 820, 832–34, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Preiser v. Rodriguez*, 411 U.S. 475, 488–90, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); *United States v. Demko*, 385 U.S. 149, 151–52, 87 S.Ct. 382, 17 L.Ed.2d 258 (1966); *Stonite Prods. Co. v. Melvin Lloyd Co.*, 315 U.S. 561, 566–67, 62 S.Ct. 780, 86 L.Ed. 1026 (1942). For example, in *Preiser*, the Court expressly held that state prisoners could not seek redress for the loss of good-time credits under the Civil Rights Act, 42 U.S.C. § 1983, even though their complaint came within the literal terms of that statute because the federal habeas corpus statute, 28 U.S.C. § 2254, was the "more specific act." *Preiser*, 411 U.S. at 489, 93 S.Ct. 1827. The Court stated that in amending the habeas corpus laws, Congress clearly required exhaustion of state remedies as a condition precedent to invocation of federal judicial relief, and it would frustrate Congressional intent to hold that claimants could evade this requirement through the expedient of putting a different label on their pleadings. *Id.* Similarly, in *Brown*, the Court held that Title VII provided the exclusive remedy for a federal employee who alleged race discrimination because:

The balance, completeness, and structural integrity of § 717 are inconsistent with the petitioner's contention that the judicial remedy afforded by § 717(c) was designed merely to supplement other putative judicial relief .... Under the petitioner's theory, by perverse operation of a type of Gresham's law, § 717, with its rigorous administrative exhaustion requirements and time limitations, would be driven out of currency were immediate access to the courts under other, less demanding statutes permissible. The crucial administrative role that each agency together with the Civil Service Commission was given by Congress in the eradication of employment discrimination would be eliminated "by the simple expedient of putting a different label on (the) pleadings." *Preiser v. Rodriguez*, 411 U.S. 475, 489–490, 93 S.Ct. 1827, 1836, 36 L.Ed.2d 439, 450 (1973). It would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading.

*Brown*, 425 U.S. at 832–33, 96 S.Ct. 1961.

As in the cases cited above, the CDA provides a general set of remedies—in this case for a variety of contract disputes involving federal agencies. By enacting the Northwest Power Act, Congress created a detailed framework which was more narrowly drawn to apply specifically to the BPA, and which created an integrated scheme of regulations and remedies. By its terms, that scheme is incompatible with the remedies afforded by the CDA. To highlight the type of conflict most salient to Puget Sound, the Northwest Power Act specifies the times that certain actions must be deemed final and thereby become subject to judicial review within ninety days. 16 U.S.C. § 839f(e)(1). Rate determinations, for example, are deemed final when approved by the FERC. 16 U.S.C. §§ 839e(i)(6), 839f(e)(1)(G). By contrast,

under the CDA an executive agency's consideration of a contract related claim for greater than $100,000 may only be considered final and reviewable after a written certified claim meeting its requirements has been presented to the agency's "contracting officer." *See e.g., W.M. Schlosser Co. v. United States,* 705 F.2d 1336, 1338 (Fed.Cir.1983); *see also* 41 U.S.C. § 605(a),(b). Were the CDA applicable, these two rules would come into direct conflict in a number of cases. For example, we have held that we have jurisdiction to consider claims challenging a rate-making as violating a prior contract entered into by the BPA. *Jura,* 876 F.2d at 746–48; *see also Atlantic Richfield Co. v. Bonneville Power Administration,* 818 F.2d 701, 705 (9th Cir.1987) (considering a breach of contract claim based on certain charges established through formal rate-making). Under the Act, a petitioner challenging such a rate would be required to seek judicial review within ninety days of its approval, while the CDA would permit it to file a claim with the BPA and then require it to wait for a response before petitioning the court.

Moreover, this conflict is not an accident; it reflects the fact that the Northwest Power Act was enacted by Congress for reasons with which the procedures of the CDA are incompatible. This court has recognized that an important goal of Congress in enacting the Northwest Power Act was to expedite litigation challenging BPA actions. *See Pacific Power & Light Co.,* 795 F.2d at 815; *see also* H.R.REP. No. 96–976 (Part II) 30–31 (1980). It thus provides for direct review to the Ninth Circuit and establishes a short limitations period. By contrast, the CDA provides for a much more relaxed time frame. *See e.g.* 41 U.S.C. § 605(a) (providing a six-year limitations period for raising CDA claims with an executive agency). Were a petitioner permitted to invoke the CDA for a claim subject to our review, and thereby

render a final decision non-final, the effect would be to extend the life of the dispute by as much as six years. In short, allowing Puget Sound to insert the CDA limitations period into the Northwest Power Act by attempting to contract around the latter's procedures would frustrate Congressional purpose.

We thus hold that the procedures provided by the CDA were not applicable in this context. The BPA's implementation of Schedule CO–94 through the true-up to actuals was final as of June 4, 1998. Because Puget Sound's petition was brought more than 90 days after this date we lack jurisdiction to consider it.

## CONCLUSION

For the foregoing reasons Puget Sound's petition for review under the Northwest Power Act is DISMISSED for lack of jurisdiction.