**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IDAHO CONSERVATION
LEAGUE; GREAT OLD BROADS
FOR WILDERNESS; IDAHO
RIVERS UNITED,

                *Petitioners*,

  v.

BONNEVILLE POWER
ADMINISTRATION,

                *Respondent*,

----------------------------------------

ALLIANCE OF WESTERN
ENERGY CONSUMERS;
NORTHWEST REQUIREMENTS
UTILITIES; PUBLIC POWER
COUNCIL INC,

                *Intervenors*.

Nos. 23-593
24-1653

OPINION

On Petitions for Review of Orders of the
Bonneville Power Administration

Argued and Submitted December 2, 2024
San Francisco, California

Filed June 26, 2025

Before: Milan D. Smith, Jr., Eric D. Miller, and Patrick J.
Bumatay, Circuit Judges.

Opinion by Judge Miller

## SUMMARY[*]

### Northwest Power Act

The panel denied petitions for review brought by
environmental groups led by the Idaho Conservation League
(ICL) challenging the decision of the Bonneville Power
Administration (BPA) to spend only about 10 percent of its
excess financial reserves on measures to protect fish and
wildlife.

BPA is a federal agency responsible for marketing power
generated at federal hydroelectric facilities in the Columbia
River Basin.  To maintain stable rates for the power it sells,
BPA holds financial reserves.  When those reserves grow too
large, BPA is required to spend the excess money. ICL
argued that BPA's decision to spend only about 10 percent
of its excess reserves on measures to protect fish and wildlife
transgressed its obligations under section 4(h)(11)(A) of the
Pacific  Northwest  Electric  Power  Planning  and
Conservation Act, also known as the Northwest Power Act
(NWPA).  Section 4(h)(11)(A) requires BPA to exercise its
responsibilities in a manner that provides equitable treatment

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

for fish and wildlife, and to take into account "to the fullest extent practicable" an environmental mitigation and protection program adopted by the Northwest Power and Conservation Council (Council).

The panel held that the petitions for review were timely because they were filed within 90 days of BPA's final allocation of its excess reserves. The cases were not moot because, although BPA has distributed the funds from 2022 and perhaps from 2023 as well, BPA's decisions about how to allocate its excess reserves raised issues that were capable of repetition while evading review.

On the merits, the panel held that BPA's allocation of its excess financial reserves was not subject to the requirements of section 4(h)(11)(A) of the NWPA. A separate provision of the NWPA, section 4(h)(10), specifically addresses BPA's use of the excess financial reserve fund for fish and wildlife, and does not require that fish and wildlife be put on an equal footing with BPA's power interests, nor does it require that BPA prioritize the Council's program "to the fullest extent practicable." Instead, section 4(h)(10)(A) requires BPA to consider the Council's plan and ensure that spending under that section be "consistent with the plan." Because section 4(h)(11)(A)'s obligations do not govern BPA's choice of how to spend its excess reserves, the panel denied the petitions for review.

## COUNSEL

Andrew R. Missel (argued) and Laurence J. Lucas, Advocates For The West, Boise, Idaho, for Petitioners.

J. Courtney Olive (argued), Special Assistant United States Attorney; Richard A. Greene, Neal M. Gschwend, and B. Tucker Miles, Attorneys; Timothy A. Johnson and Anne E. Senters, Assistant General Counsels; Marcus H. Chong Tim, General Counsel; Bonneville Power Administration, Portland, Oregon; Sean E. Martin, Assistant United States Attorney; Natalie K. Wright, United States Attorney; Office of the United States Attorney, United States Department of Justice, Portland, Oregon; for Respondent.

Sommer Moser, Davison Van Cleve PC, Portland, Oregon; Matthew Schroettnig, Northwest Requirements Utilities, Portland, Oregon; Thomas Creekpaum, Public Power Council, Portland, Oregon; for Intervenors.

John Shurts, Northwest Power and Conservation Council, Portland, Oregon, for Amicus Curiae Northwest Power and Conservation Council.

**OPINION**

MILLER, Circuit Judge:

The Bonneville Power Administration (BPA) is a federal agency responsible for marketing power generated at various federal hydroelectric facilities in the Columbia River Basin. To maintain stable rates for the power it sells, BPA holds financial reserves. When those reserves grow too large, BPA spends the excess money. In these petitions for review, environmental groups led by the Idaho Conservation League (ICL) challenge BPA's decision to spend only about 10 percent of its excess reserves on measures to protect fish and wildlife. ICL argues that BPA's decision transgressed BPA's obligations under section 4(h)(11)(A) of the Pacific Northwest Electric Power Planning and Conservation Act, also known as the Northwest Power Act (NWPA), Pub. L. No. 96-501, 94 Stat. 2697, 2710–11 (1980), 16 U.S.C. § 839b(h)(11)(A). We hold that those obligations do not govern BPA's choice of how to spend its excess reserves, so we deny the petitions for review.

I

Congress created BPA in 1937 to improve power generation and transmission in the Pacific Northwest. *See generally* 16 U.S.C. § 839; *see also Northwest Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 672 (9th Cir. 2007). Today, BPA markets power from more than 30 facilities throughout the Columbia River Basin and is responsible for roughly one-third of the power consumed in the Pacific Northwest.

Although the hydroelectric facilities in the Columbia River Basin are important sources of electricity, they have also contributed to the decline of what were once the largest

salmon runs in the world. *See Northwest Res. Info. Ctr., Inc. v. Northwest Power Plan. Council*, 35 F.3d 1371, 1375–76 (9th Cir. 1994). In 1980, Congress enacted the NWPA to balance BPA's power-marketing objectives with environmental considerations, including the conservation of fish and wildlife. *See* 16 U.S.C. § 839b(h)(1)(A); *Northwest Res. Info. Ctr.*, 35 F.3d at 1377. The NWPA created the Northwest Power and Conservation Council (Council), a policymaking body comprising representatives of the state governments of Idaho, Montana, Oregon, and Washington. *See Idaho Conservation League v. Bonneville Power Admin.* (*ICL I*), 83 F.4th 1182, 1186 (9th Cir. 2023). In consultation with affected Indian tribes, the Council "develop[s] a policy document, called the 'Program,' which lays out measures to protect, mitigate, and enhance the fish and wildlife that are affected by dam and reservoir projects within the Columbia River Basin." *Id.*; *see* 16 U.S.C. § 839b(h)(1)(A). The NWPA tasks BPA with implementing that program and undertaking its various responsibilities in a manner consistent with the program. *See id.* § 839b(h)(10), (11).

Unlike most federal agencies, BPA does not receive annual appropriations from Congress. Rather, it uses power-marketing revenues, which are deposited in the "BPA fund," to finance its expenses. *See* 16 U.S.C. § 838i(a). This financing scheme requires BPA to set its power rates at a level sufficient to cover its projected costs while also providing "the lowest possible rates to consumers." *Id.* § 838g. BPA does so through periodic proceedings known as "rate cases." *See id.* § 839e(i); *ICL I*, 83 F.4th at 1185.

Varying market conditions sometimes make BPA's revenue and cost projections inaccurate. To ensure rate stability, BPA attempts to maintain financial reserves in the BPA fund as a cushion against unexpectedly low revenues

or high costs. But when revenues are higher or costs are lower than BPA anticipated, excess financial reserves accumulate. When financial reserves cross a certain threshold, BPA's financial-reserves policy requires it to spend them. A Reserve Distribution Clause (RDC), which BPA adopts as part of the rate case, governs how those excess reserves may be spent. During the period at issue here, the RDC permitted BPA to use its excess reserves for "debt reduction, incremental capital investment, rate reduction through a Power Dividend Distribution . . . , distribution to customers, or any other Power-specific purposes determined by the Administrator." Before spending excess reserves, BPA publishes the amount it intends to spend, the allocation of that amount, and the data underlying those decisions. It then must hold at least one public meeting and provide an opportunity for comment on its proposal before making a final decision.

In both fiscal year 2022 and fiscal year 2023, the RDC required BPA to spend excess reserves. For 2022, BPA proposed allocating 70 percent of the excess reserves to its customers through a power dividend distribution, 20 percent to debt reduction, and 10 percent to addressing the maintenance needs of existing assets designed to mitigate the impact of hydroelectric power generation on fish and wildlife. The proposed allocation in 2023 was similar: 58.0 percent for a power dividend distribution, 31.5 percent for debt reduction, and 10.5 percent for fish and wildlife mitigation assets. Across both years, BPA proposed allocating a total of $80 million of its excess reserves to fish and wildlife mitigation assets, from a pool of $785.4 million.

In both years, BPA received comments on the proposed allocation from interested parties, including States, tribes, and environmental organizations. Many commenters,

including ICL, objected that the proposed allocation to fish and wildlife mitigation efforts was too limited. As relevant here, ICL argued that BPA had failed to comply with a pair of statutory obligations in the NWPA. Those duties—codified in section 4(h)(11)(A) of the NWPA—require BPA and other agencies that are "responsible for managing, operating, or regulating Federal or non-Federal hydroelectric facilities located on the Columbia River or its tributaries" to exercise their responsibilities "in a manner that provides equitable treatment for . . . fish and wildlife" and to "tak[e] into account at each relevant stage of decisionmaking processes to the fullest extent practicable, the program adopted by the Council." 16 U.S.C. § 839b(h)(11)(A).

BPA defended its proposed allocation on the ground that section 4(h)(11)(A) of the NWPA does not apply to funding decisions for fish and wildlife but only to the physical operation and management of hydroelectric facilities. BPA ultimately finalized its preliminary allocation.

ICL filed two petitions for review: one challenging the allocation of excess reserves for 2022 and another challenging the allocation of excess reserves for 2023. *See* 16 U.S.C. § 839f(e).

## II

We begin by considering whether the petitions were timely filed. The NWPA provides for judicial review of a final action taken by BPA if a petition for review is "filed within ninety days of the time such action or decision is deemed final." 16 U.S.C. § 839f(e)(5). ICL filed each petition within 90 days of BPA's allocation decisions, but BPA contends that the "true nature" of the petitions is to challenge final actions taken much earlier. *See Puget Sound Energy, Inc. v. United States*, 310 F.3d 613, 621–22 (9th Cir.

2002). BPA conceives of the challenges as either (1) to the RDC itself or (2) to funding decisions that occurred even further in the past. We disagree.

ICL challenges BPA's decisions to allocate only about 10 percent of its excess financial reserves in 2022 and 2023 to fish and wildlife mitigation efforts. BPA responds that ICL's claims relate "to how the RDC provision functions—*i.e.*, the criteria BPA would use when implementing that provision of the rate schedule." But as BPA concedes, the RDC merely sets out *permissible* uses for excess financial reserves; it does not require BPA to allocate any particular amount to any particular use. Thus, the alleged underfunding of fish and wildlife efforts of which ICL complains did not materialize when the RDC was adopted. It happened later, when the excess financial reserves were allocated in the decisions that ICL now challenges.

BPA's alternative conception of ICL's challenges is similarly flawed. Contrary to BPA's characterization, ICL is not challenging what it believes to be the chronic underfunding of fish and wildlife projects that occurred many years ago. It is challenging BPA's decision not to spend more money now. In ICL's view, spending more money now is necessary to ameliorate the effects of chronic underfunding, but that does not transform the petitions into challenges to past underfunding.

Because both petitions for review were filed within 90 days of BPA's final allocation of its excess reserves, they satisfy the statutory time limit. But they are arguably too late in a different sense: As ICL concedes, BPA has now distributed the funds from 2022, and perhaps (though it is unclear from the parties' briefing) from 2023 as well. That raises the possibility that the cases are moot, and although

BPA does not raise a mootness objection, we must consider the issue sua sponte because it affects our subject-matter jurisdiction. *See Demery v. Arpaio*, 378 F.3d 1020, 1025 (9th Cir. 2004).

The cases are not moot because ICL's challenges to BPA's decisions about how to allocate its excess reserves raise issues that are capable of repetition while evading review. *See Turner v. Rogers*, 564 U.S. 431, 439–40 (2011); *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 786 (9th Cir. 2012). That limited exception to mootness applies when "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Turner*, 564 U.S. at 439–40 (alterations in original) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam)).

That test is satisfied here. First, because BPA's allocation of excess reserves covers only a single fiscal year, its decisions have too short a duration to be fully litigated before the reserves are distributed. The 2022 decision is illustrative: BPA issued its final decision on January 6, 2023, but by the time ICL filed its opening brief, the 2022 funds had already been fully distributed. *See Alcoa*, 698 F.3d at 787 ("[A]s a practical matter a transaction set for a term of 17 months . . . would be likely to expire before our review (let alone the Supreme Court's) could be completed."). Second, ICL can reasonably be expected to be subject to the same action again in the future. After ICL petitioned for review of the 2022 decision, but before any adjudication of the legality of that decision, BPA announced a 2023 allocation that was similar in relevant respects. The repetitive nature of BPA's actions demonstrates that ICL has

a reasonable expectation of facing BPA's allegedly illegal conduct again. *See id.* We therefore conclude that the cases are not moot.

## III

On the merits, the petitions turn on whether section 4(h)(11)(A) of the NWPA governs BPA's decisions about how to allocate excess reserves. That provision states:

(A) The [BPA] Administrator and other Federal agencies responsible for managing, operating, or regulating Federal or non-Federal hydroelectric facilities located on the Columbia River or its tributaries shall—

(i) exercise such responsibilities consistent with the purposes of this chapter and other applicable laws, to adequately protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, affected by such projects or facilities in a manner that *provides equitable treatment for such fish and wildlife* with the other purposes for which such system and facilities are managed and operated;

(ii) exercise such responsibilities, *taking into account at each relevant stage of decisionmaking processes to the fullest extent practicable, the*

> *program adopted by the Council*
> *under this subsection.*

16 U.S.C. § 839b(h)(11)(A) (emphasis added). Section 4(h)(11)(A) thus imposes two requirements: an "obligation to provide 'equitable treatment' for fish and wildlife," and an obligation "to 'tak[e] into account' the Council's Program 'at each relevant stage of decisionmaking processes to the fullest extent practicable.'" *ICL I*, 83 F.4th at 1191 (alteration in original).

BPA contends that those requirements apply only to operational decisions "relating to physical water management"—in other words, turning valves and throwing switches. BPA emphasizes that section 4(h)(11)(A)(i) refers to the "purposes for which such system and facilities are managed and operated," and it observes that the system and facilities at issue are dams and reservoirs whose "purposes depend on or involve, in some way, the physical storage or movement of water." ICL responds by pointing to the initial clause of section 4(h)(11)(A), which imposes duties on BPA "and other federal agencies responsible for managing, operating, or regulating" the facilities in the Columbia River Basin. It argues that those terms—especially "managing"—are capacious enough to cover non-operational decisions, including financial-management decisions such as the allocation of excess reserves.

In resolving that dispute, we do not read the words of section 4(h)(11)(A) in a vacuum. To the contrary, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989); *see also Brown v. Gardner*, 513 U.S. 115, 118 (1994)

("Ambiguity is a creature not of definitional possibilities but of statutory context."). "We must thus interpret § 4(h)(11)(A) within the 'overall structure and design' of the statute that Congress enacted." *ICL I*, 83 F.4th at 1192 (quoting *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1035 (9th Cir. 2022)).

The text and structure of the NWPA persuade us that section 4(h)(11)(A) does not apply to BPA's decision about how to allocate excess reserves. As we have explained, BPA's excess financial reserves accumulate in the BPA fund. A separate provision of the NWPA, section 4(h)(10), specifically addresses BPA's use of that fund for fish and wildlife. *See* 16 U.S.C. § 839b(h)(10). Significantly, section 4(h)(10) contains provisions that cover the same subjects as section 4(h)(11)(A) but impose different substantive requirements. For example, section 4(h)(10)(A) requires that BPA "use the [BPA] fund . . . to protect, mitigate, and enhance fish and wildlife *to the extent affected* by the development and operation of any hydroelectric project of the Columbia River and its tributaries." *Id.* § 839b(h)(10)(A) (emphasis added). That language permits BPA to calibrate fish and wildlife funding based on the disruptiveness of its hydroelectric power operations. It does not require that fish and wildlife be put on an equal footing with BPA's power interests, which is what we have interpreted section 4(h)(11)(A)(i)'s "equitable treatment" language to mandate. *See Confederated Tribes of Umatilla Indian Rsrv. v. Bonneville Power Admin.*, 342 F.3d 924, 931 (9th Cir. 2003) (explaining that the "equitable treatment" mandate requires BPA to "consider[] fish on par with power").

Likewise, section 4(h)(10)(A) directs BPA to use the BPA fund to "protect, mitigate, and enhance fish and wildlife . . . *in a manner consistent with* . . . the program

adopted by the Council." 16 U.S.C. § 839b(h)(10)(A) (emphasis added). For BPA to act "in a manner consistent with the program" does not require it to prioritize the program as much as it practicably can, which is what section 4(h)(11)(A) demands. *See* 16 U.S.C. § 839b(h)(11)(A) (requiring BPA to "tak[e] into account at each relevant stage of decisionmaking processes *to the fullest extent practicable*, the program adopted by the Council" (emphasis added)).

If we were to adopt ICL's position and construe section 4(h)(11)(A) to apply to BPA's decisions about how to spend excess reserves, that provision would conflict with section 4(h)(10)(A). But we must read a statute "to harmonize and give meaningful effect to all of [its] provisions." *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 680 (2010). Thus, we understand the statute to provide that section 4(h)(10)(A) governs the allocation of excess reserves, but section 4(h)(11)(A) does not.

ICL attempts to reconcile sections 4(h)(10)(A) and 4(h)(11)(A) by arguing that the former grants BPA the authority to use the BPA fund for fish and wildlife protection, while the latter constrains how BPA may do so. We find that dichotomy unpersuasive. If Congress meant section 4(h)(10)(A) to authorize BPA to exercise authority subject to the constraints of section 4(h)(11)(A), we would expect it to have said so. But nowhere in section 4(h)(10)(A) did Congress mention section 4(h)(11)(A) or its substantive requirements. *Cf. ICL I*, 83 F.4th at 1192 (applying the same logic to ratemaking).

In addition, ICL's characterization of section 4(h)(10)(A) as merely an authority-granting provision ignores the rest of the text. Elsewhere in section 4(h)(10), Congress imposed significant procedural requirements on

BPA's use of the authority that it granted. For example, when BPA funds fish and wildlife projects from its annual fish and wildlife budget, which implements the Council's plan, the NWPA requires that it submit its project proposals to the Council's Independent Scientific Review Panel. 16 U.S.C. § 839b(h)(10)(D)(i). The statute further requires that the Council create Scientific Peer Review Groups to assist that Panel "in making its recommendations to the Council for projects to be funded through BPA's annual fish and wildlife budget." *Id.* § 839b(h)(10)(D)(ii). And it requires that members of the Panel and the Peer Review Groups be selected from a list of scientists submitted by the National Academy of Sciences. *Id.* In light of those detailed, highly technical requirements—and the absence of any cross-reference in the statute—we do not believe that Congress subjected BPA's implementation of its annual fish and wildlife budget to the additional requirements of section 4(h)(11)(A). Yet that would be the logical implication of ICL's theory.

ICL argues that BPA's interpretation is undermined by BPA's concession that certain power-marketing activities are subject to section 4(h)(11)(A). Power marketing is the purchase and sale of power to and from the grid, and BPA sometimes purchases power to ease the power-generation requirements at facilities across the Basin to make it easier for fish to migrate. Those power purchases are made using the BPA fund, so ICL contends that they are no different from BPA's allocation of excess reserves. *See* 16 U.S.C. § 838i(b)(6)(iv). But when Congress authorized BPA to purchase power using money from the BPA fund, it specified that it was doing so, in part, to allow BPA to fulfill its obligations to fish and wildlife under section 4(h)(11)(A). *See id.* (authorizing BPA to "purchase . . . electric

power . . . on a short term basis to meet [its] obligations under section 4(h)"). That leaves little doubt that Congress considered BPA's power-marketing activities to be part of BPA's "responsibilities" for "managing, operating, or regulating . . . hydroelectric facilities" in the Columbia River Basin. 16 U.S.C. § 839b(h)(11)(A). By contrast, the statutory provision that authorizes BPA to use the BPA fund for fish and wildlife mitigation projects, section 4(h)(10)(A), contains no indication that Congress considered that funding activity to be part of those responsibilities. Rather, that provision's inclusion of other requirements, relating to fish and wildlife and to the Council's plan, suggests the opposite.

Our interpretation is reinforced by our decision in *ICL I*, in which we held that section 4(h)(11)(A) does not apply to BPA's rate-setting decisions. *See* 83 F.4th at 1192. In that case, ICL argued that BPA had set its rates too low, preventing it from generating the revenue necessary to comply with section 4(h)(11)(A)'s mandate. *See id.* But, guided by the structure of the NWPA, we held that section 4(h)(11)(A) does not constrain ratemaking. *See id.* at 1192. We observed that section 7 of the NWPA, 16 U.S.C. § 839e, "prescribes extensive requirements and procedures for BPA's ratemakings," yet it does not "so much as acknowledge § 4(h)(11)(A), much less the significant obligations that it imposes when it applies." 83 F.4th at 1192. And we noted that section 7 requires BPA to weigh various "equitable" considerations without mentioning section 4(h)(11)(A)'s "equitable treatment" mandate. *Id.* at 1193. We saw no reason "why Congress would have enacted extensive provisions governing ratemaking in § 7, only to layer on major additional environmental mitigation-related requirements in a wholly separate provision that does not even discuss ratemaking." *Id.* at 1192. As we have

explained, similar features of section 4(h)(10)(A) support an analogous inference here.

ICL attempts to distinguish *ICL I* on the theory that the "exceedingly detailed" nature of the ratemaking process in section 7 created a strong inference that Congress meant to exclude ratemaking decisions from section 4(h)(11)(A)'s coverage. *See ICL I*, 83 F.4th at 1192. In contrast, ICL contends, BPA's decision making about how to allocate its excess financial reserves is "highly informal," making a comparable inference unreasonable. But no matter how informal BPA's process for allocating its excess reserves may be, it is authorized by a complex statutory provision that, like section 7, imposes obligations related to fish and wildlife without mentioning the fish and wildlife obligations contained in section 4(h)(11)(A). Section 7 requires BPA to "equitably allocate to power rates . . . all costs and benefits . . . including, but not limited to, . . . fish and wildlife measures." 16 U.S.C. § 839e(g). Section 4(h)(10)(A), as explained, requires BPA to "protect, mitigate, and enhance fish and wildlife to the extent affected by the development and operation of any hydroelectric project of the Columbia River and its tributaries" and to use the BPA fund "in a manner consistent with . . . the program adopted by the Council." 16 U.S.C. § 839b(h)(10)(A). Neither provision mentions section 4(h)(11)(A), and the reasoning we employed in *ICL I* applies equally here.

ICL argues that our conclusion is in tension with two of our prior decisions: *Northwest Env't Def. Ctr. v. Bonneville Power Admin.* (*NEDC*), 117 F.3d 1520 (9th Cir. 1997), and *Confederated Tribes*, 342 F.3d 924. In *NEDC*, the petitioners argued that BPA violated section 4(h)(11)(A) by acquiring new water storage capacity but failing to dedicate enough of that capacity to fish and wildlife interests. 117 F.3d at 1532.

In evaluating that argument, we explained that "BPA's responsibilities to protect fish and wildlife do not end with even complete adoption of the Council's Program." *Id.* But we did not say, as ICL suggests, that the "equitable treatment" mandate encompasses BPA's obligation to fund fish and wildlife mitigation efforts. To the contrary, we described the "equitable treatment" mandate as "independent" of BPA's responsibilities vis-à-vis the Council's Program. *Id.* And our concern in *NEDC* was principally with what section 4(h)(11)(A) requires when it applies, not, as in this case, with the antecedent question of which actions it applies to. We had no occasion to consider that question in *NEDC* because the challenged decision—how much water-storage capacity to dedicate to fish and how much to dedicate to electricity production—bore directly on BPA's operation and management of its hydroelectric facilities, and BPA did not argue otherwise.

In *Confederated Tribes*, petitioners challenged a BPA decision document as violative of the "equitable treatment" mandate because it "lack[ed] a special document or section fully detailing its efforts to treat wildlife and fish on par with power." 342 F.3d at 931. In response, BPA pointed out that it "continues undiminished its expenditures to support fish and wildlife measures." *Id.* at 932. ICL reads that concession to be inconsistent with BPA's position in this case—namely, that financial decisions are not subject to the equitable-treatment mandate. But all that BPA acknowledged in *Confederated Tribes* is that it *may* fulfill its equitable-treatment mandate by allocating money to fish and wildlife protection efforts. For example, if BPA decides against reducing hydroelectric operations at a particular facility, it may attempt to offset any resulting harm to fish and wildlife through mitigation spending. It does not follow that BPA

*must* endeavor to satisfy its section 4(h)(11)(A) obligations that way.

Finally, ICL argues that construing section 4(h)(11)(A) as not governing BPA's allocation of its excess reserves will "undermine[] the overall efficacy of the Council's Fish and Wildlife Program, frustrating the statutory scheme." Of course, although promoting the Council's program was undoubtedly one of Congress's purposes, we do not presume "that any result consistent with . . . the statute's overarching goal must be the law." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017). In any event, we find ICL's policy concern unfounded. As we have explained, section 4(h)(10)(A)—which all agree governs BPA's use of the BPA fund for fish and wildlife protection—requires BPA to consider the Council's plan and ensure that spending under that section be "consistent with the plan." 16 U.S.C. § 839b(h)(10)(A). BPA need not also comply with the requirements of section 4(h)(11)(A) to take a comprehensive approach to fish and wildlife protection.

In sum, we hold that BPA's allocation of its excess financial reserves is not subject to the requirements of section 4(h)(11)(A) of the NWPA.

**PETITIONS DENIED.**