**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE; GREAT OLD BROADS FOR WILDERNESS; IDAHO RIVERS UNITED, | No. 22-70122 |
| *Petitioners*, | |
| v. | OPINION |
| BONNEVILLE POWER ADMINISTRATION, | |
| *Respondent*, | |
| NORTHWEST REQUIREMENTS UTILITIES; ALLIANCE OF WESTERN ENERGY CONSUMERS; PUBLIC POWER COUNCIL; PUGET SOUND ENERGY INC, | |
| *Intervenors*. | |

On Petition for Review of an Order of the
Bonneville Power Administration

Argued and Submitted June 8, 2023
Seattle, Washington

Filed October 16, 2023

Before:  Michael Daly Hawkins, Carlos T. Bea, and Daniel A. Bress, Circuit Judges.

Opinion by Judge Bress;
Dissent by Judge Bea

## SUMMARY[*]

**Bonneville Power Administration / Article III Standing**

The panel denied a petition for review brought by environmental groups alleging that the Bonneville Power Administration ("BPA") failed to comply with its statutory duties in the Northwest Power Act ("NWPA") relating to fish and wildlife when BPA issued a decision setting power rates for the 2022-2023 fiscal period ("BP-22").

BPA is a federal agency tasked with selling the power generated at various hydroelectric facilities in the Pacific Northwest.  The Pacific Northwest Electric Power and Conservation Planning Council ("the Council") is a policymaking body responsible for developing a document called the "Program," which lays out measures to protect, mitigate, and enhance the fish and wildlife that are affected by dam and reservoir projects within the Columbia River Basin.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Petitioners alleged that in its BP-22 ratemaking, BPA failed to abide by NWPA § 4(h)(11)(A), which requires BPA provide equitable treatment for fish and wildlife, and take into account the Council's Program.

The panel held that petitioners had Article III standing. First, petitioners have alleged injury in fact where they are interested in the fish populations in the Columbia River Basin, and ongoing harm to these fish populations inflicts an injury on petitioners' members. Second, any harm to the fish populations is traceable to BPA's BP-22 ratemaking. Third, petitioners have adequately alleged redressability where it is a reasonable inference from the historical record that petitioners' injuries would be at least partially redressed by a favorable decision on the merits.

Turning to the merits, the panel held that the text and structure of the NWPA as a whole convincingly provides that NWEPA § 4(h)(11)(A) does not apply to ratemaking where that provision does not mention ratemaking, and other features of the statutory scheme buttress this conclusion.

Dissenting, Judge Bea would hold that petitioners have not demonstrated that they have Article III standing because the alleged injury is not fairly traceable to BPA's ratemaking decisions, and therefore this court lacks subject matter jurisdiction over the petition for review.

**COUNSEL**

Andrew R. Missel (argued), Advocates for the West, Portland, Oregon; Laurence J. Lucas, Advocates for the West, Boise, Idaho; for Petitioners.

J. Courtney Olive (argued), Special Assistant United States Attorney, Bonneville Power Administration, Office of General Counsel, Portland, Oregon; Sean E. Martin, Assistant United States Attorney; Natalie K. Wight, United States Attorney; United States Attorney's Office, Portland, Oregon; Marcus H. Chong Tim, General Counsel; Timothy A. Johnson and Anne E. Senters, Assistant General Counsels; Richard A. Greene and B. Tucker Miles, Attorneys; Bonneville Power Administration, Portland, Oregon; for Respondent

Matthew Schroettnig, General Counsel, Northwest Requirements Utilities, Portland, Oregon, for Intervenor Northwest Requirements Utilities.

Sommer Moser, Davison Van Cleve PC, Portland, Oregon, for Intervenor Alliance of Western Energy Consumers.

Irene A. Scruggs, Attorney, Public Power Council, Portland, Oregon; Steve J. Odell, Marten Law LLP, Portland, Oregon; for Intervenor Public Power Council.

Jason T. Kuzma, Puget Sound Energy Inc., Bellevue, Washington, for Intervenor Puget Sound Energy Inc.

Richard K. Eichstaedt, Eichstaedt Law Offices PLLC, Spokane, Washington; Ted C. Knight, Special Legal Counsel, Ted C. Knight Law, Bainbridge Island, Washington; for Amicus Curiae Coeur d'Alene Tribe and Spokane Tribe of Indians.

# OPINION

BRESS, Circuit Judge:

The Bonneville Power Administration (BPA) is a federal agency tasked with selling the power generated at various hydroelectric facilities in the Pacific Northwest. In the decision on review, BPA set its rates for the 2022–2023 fiscal period. Environmental groups now petition for review of that decision, arguing that BPA failed to comply with a pair of statutory duties in the Northwest Power Act relating to fish and wildlife. *See* 16 U.S.C. § 839b(h)(11)(A). Because we conclude that these duties do not apply to BPA's ratemakings, we deny the petition.

## I

## A

Created in 1937, BPA is a federal power-marketing agency within the Department of Energy. *See Nw. Env't Def. Ctr. v. Bonneville Power Admin.* (*NEDC 2007*), 477 F.3d 668, 672 (9th Cir. 2007). BPA is responsible for marketing electric power generated from the Federal Columbia River Power System, which is comprised of 31 federal hydroelectric dams in the Columbia River Basin that are operated by the U.S. Army Corps of Engineers and the Bureau of Reclamation. *See id.* at 672–73. BPA also markets power from a non-federal nuclear plant and several other non-federal power plants. *NEDC 2007*, 477 F.3d at 673. Taken together, BPA provides about a third of the power generated in the Pacific Northwest. BPA's customers include federal agencies, public and private utilities, and direct service industrial customers. *Id.*

BPA's funding system differs from most federal agencies in that BPA does not obtain annual appropriations from Congress.  *Id.*  Instead, BPA's operations are financed from the "BPA fund," which is sourced from the revenue BPA generates through its sales and transmission of electricity.  *Id.*  Because BPA is self-financed, it must set its rates high enough to cover costs.  *Id.* (citing *Indus. Customers of Nw. Utils. v. Bonneville Power Admin.*, 408 F.3d 638, 641 (9th Cir. 2005)).  Yet by statute, BPA must also sell power "at the lowest possible rates."  16 U.S.C. § 838g.

BPA sets its rates through ratemakings, called "rate cases," a process that resembles agency rulemaking.  *See* 16 U.S.C. § 839e(i); *see also Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.* (*APAC*), 126 F.3d 1158, 1176 (9th Cir. 1997).  Built into this process are numerous opportunities for the public and interested parties to participate, including by submitting written briefs to the agency.  *See* 16 U.S.C. § 839e(i)(1)–(3); *see also* Final Rules of Procedure, 83 Fed. Reg. 39,993-01, 40,009 (Aug. 13, 2018).

To determine the rates that it needs to charge to maintain its operations, BPA relies on estimates of its anticipated spending.  These projections are not made in the rate proceeding but are determined ahead of time through a process called Integrated Program Review (IPR).  *See* Fiscal Year (FY) 2022-2023 Proposed Power and Transmission Rate Adjustments Public Hearing and Opportunities for Public Review and Comment, 85 Fed. Reg. 77,189-01, 77,190 (Dec. 1, 2020).  In the IPR process, BPA prepares estimates of its expenses and capital spending and allows interested parties the opportunity to review and comment on them.

In neither IPR nor ratemaking does BPA set specific funding levels for different programs, nor does it decide which costs to incur. As BPA explained in its Record of Decision (ROD) on review here, ratemaking determines "*how* to recover BPA's forecasted costs . . . , not *whether* to incur a cost or *which* costs to incur." Put differently, at this stage "BPA's funding projections are general in nature" because "BPA is not finally deciding what programs to pursue or how it will meet its various obligations over the rate period." *Cf. Golden Nw. Aluminum, Inc. v. Bonneville Power Admin.* (*Golden Northwest*), 501 F.3d 1037, 1053 (9th Cir. 2007) (explaining that the rate case is "not the forum for making decisions regarding which fish and wildlife alternative[s] to implement"). BPA's focus during ratemaking is thus on recovering costs that it generally expects to incur in carrying out its duties, meeting its legal obligations, and pursuing its objectives. *See* 16 U.S.C. § 839e(a)(1).

One such objective is BPA's Strategic Plan for 2018–2023. The Strategic Plan was adopted in response to BPA customer concerns regarding increased prices, and it centers largely on cutting costs and improving BPA's financial health. In particular, BPA sought to impose "cost-management discipline" by "hold[ing] the sum of program costs, by business line, at or below the rate of inflation through 2028." BPA's stated purpose for these measures was to "deliver on [its] public responsibilities through a commercially successful business."

Another expense BPA must plan to recover through ratemaking is the cost of complying with its environmental obligations. BPA's "[r]ates must be high enough to ensure that BPA will recover its total costs, including costs associated with 'fish and wildlife measures.'" *Golden*

*Northwest*, 501 F.3d at 1049 (quoting 16 U.S.C. § 839e(a), (g)). Thus, BPA must "develop a realistic projection of fish and wildlife costs that accurately reflect[s] the information available at the time the rates were set . . . ." *Id.* at 1053. BPA takes these projected environmental mitigation costs into account during the IPR process.

As relevant here, the key source of BPA's environmental obligations is the Pacific Northwest Electric Power Planning and Conservation Act of 1980, otherwise known as the Northwest Power Act (NWPA). Pub. L. No. 96–501, 94 Stat. 2697 (1980) (*codified at* 16 U.S.C. §§ 839–839h).[1] That statute created the Pacific Northwest Electric Power and Conservation Planning Council (known as "the Council"), a policymaking body consisting of state government members from Idaho, Montana, Oregon, and Washington. *See Seattle Master Builders Ass'n v. Pac. Nw. Elec. Power & Conservation Plan. Council*, 786 F.2d 1359, 1362 (9th Cir. 1986); *see also* 16 U.S.C. § 839b(a)(2). The Council and BPA "operate independently of each other," but "[t]heir functions directly overlap" in a few ways. *Seattle Master Builders*, 786 F.2d at 1362. Most relevant here, the Council is responsible for developing a policy document, called the "Program," which lays out measures to protect, mitigate, and enhance the fish and wildlife that are affected by dam and reservoir projects within the Columbia River Basin. *See generally* 16 U.S.C. § 839b(h).

The NWPA imposes certain environmental responsibilities on BPA, including ones tied to the Council's Program. Consistent with these obligations, BPA engages in environmental mitigation measures both at the hydroelectric facilities themselves and "offsite" in adjacent

---

[1] We note that Title 16 has not been enacted as positive law.

habitat areas. *See, e.g.*, 16 U.S.C. § 839b(h)(6)(E)(ii), (h)(8), (h)(10). Most relevant here, NWPA § 4(h)(11)(A) requires that, when exercising certain responsibilities, BPA must "provide[] equitable treatment for . . . fish and wildlife," and must "tak[e] into account" the Council's Program "to the fullest extent practicable." *See* 16 U.S.C. § 839b(h)(11)(A)(i)–(ii). At issue in this case is whether these two duties apply to the agency decision on review: BPA's "BP-22" ratemaking, which established BPA's power and transmission rates for the 2022–2023 fiscal period. We will have more to say about § 4(h)(11)(A) and related provisions in our analysis below.

B

In preparation for the BP-22 ratemaking, BPA began the associated IPR process in June 2020. The cost projections BPA announced in that process were influenced by BPA's "commit[ment] to supporting BPA's strategic plan and financial health objectives," which called for flat budgets relative to the previous rate period, including for fish and wildlife spending.

After the IPR process concluded, BPA commenced the formal BP-22 ratemaking in December 2020. At the start of this process, BPA released its initial proposal for power and transmission rates. BPA's proposal projected an increase in surplus power revenues—the amounts BPA obtains by selling power in excess of its obligations—of over $100 million.

BPA saw this as an opportunity to take one of two paths. The first option was reducing the rates charged to its customers by about 4.5%, providing "short-term rate relief." The second option was to hold rates flat and invest the surplus revenue in BPA's ongoing financial health. Taking

this second course would "support BPA's long-term strategic and financial objectives" through such means as paying down debt, funding operations and maintenance, and bolstering BPA's financial reserves.  BPA proposed taking the second option.

A thorough ratemaking process ensued, involving 34 parties, over 5,000 pages of testimony and exhibits, and multiple settlement offers.  These parties included the petitioner environmental advocacy groups, who participated extensively in the agency process.  BPA eventually reached a proposed settlement that split the difference between BPA's proposed alternatives, reducing power rates by 2.5% and taking measures to improve BPA's financial security. Most of the parties to the ratemaking did not object to the proposed settlement.  But a handful of parties, including petitioners, did.  Specifically, petitioners objected that BPA was required to abide by NWPA § 4(h)(11)(A) when projecting its spending and setting its rates, and that the settlement violated this mandate by not assigning more funds to fish and wildlife mitigation.  Essentially, petitioners want BPA to use some of its surplus in favor of greater fish and wildlife mitigation measures.

After considering petitioners' further objections, BPA concluded the ratemaking by issuing its Final ROD, which adopted the proposed settlement.  BPA then submitted its rates to the Federal Energy Regulatory Commission (FERC) for approval.  *See* 16 U.S.C. § 839e(a)(2).  Petitioners intervened in the FERC proceeding, asking FERC to disapprove the rates based on BPA's failure to comply with § 4(h)(11)(A) of the NWPA.  *See Bonneville Power Admin.*, 178 FERC ¶ 61,211 (2022).  FERC concluded that "[BPA's] compliance with its environmental review and fish and wildlife protection obligations is . . . outside the scope of

[FERC's] review," and approved the BP-22 rates. *Id.* at \*2. BPA's rates became final "upon confirmation and approval by" FERC. 16 U.S.C. § 839e(a)(2).

Petitioners now seek review in this court. We have jurisdiction under 16 U.S.C. § 839f(e)(1)(G) and § 839f(e)(5). The NWPA's judicial review provision incorporates Section 706 of the Administrative Procedure Act. *See* 16 U.S.C. § 839f(e)(2). We must uphold BPA's rate-setting unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Pub. Util. Dist. No. 1 of Douglas Cnty. v. Bonneville Power Admin.*, 947 F.2d 386, 390 (9th Cir. 1991); *see also* 5 U.S.C. § 706(2)(A).

## II

Petitioners contend that in its BP-22 ratemaking, BPA failed to abide by NWPA § 4(h)(11)(A), which requires that, in exercising certain responsibilities, BPA must "provide[] equitable treatment for . . . fish and wildlife," and "tak[e] into account" the Council's Program "to the fullest extent practicable." *See* 16 U.S.C. § 839b(h)(11)(A)(i)–(ii). Petitioners argue that BPA violated the NWPA when it did not set its rates consistent with these allegedly applicable obligations. We must first ascertain whether petitioners have Article III standing to advance this claim.

In its briefing, BPA did not contend that petitioners lacked standing. But because "we have 'an independent duty' under Article III 'to assure that standing exists,'" *Friends of Animals v. U.S. Fish & Wildlife Serv.*, 879 F.3d 1000, 1003 n.2 (9th Cir. 2018) (quoting *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013)), we ordered the parties to address standing at oral argument and to file supplemental briefs on that issue. At that point, BPA

argued that petitioners lacked Article III standing. We disagree.

To have standing, petitioners must sufficiently allege "(i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). As organizations, petitioners "may assert standing on behalf of their members as long as the 'members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Wash. Env't Council*, 732 F.3d at 1139 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000)).

"It is well established 'that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity.'" *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 943 (9th Cir. 2021) (quoting *Friends of the Earth*, 528 U.S. at 183). In this case, no one questions that petitioners are interested in the anadromous fish populations in the Columbia River Basin. Petitioners have undertaken efforts to preserve the populations of salmon and steelhead in the Basin, and their members assert individual aesthetic and other interests in the fish populations. Ongoing harm to these fish populations, which petitioners fairly allege, therefore inflicts an injury on petitioners' members. *See Nw. Env't Def. Ctr. v. Bonneville Power Admin.* (*NEDC 1997*),

117 F.3d 1520, 1528–29 (9th Cir. 1997) ("The supplemental affidavits submitted by the petitioners are sufficient to establish that any injury to fish and wildlife interests on the Columbia River would cause injury to each petitioner."); *see also WildEarth Guardians v. U.S. Forest Serv.*, 70 F.4th 1212, 1216 (9th Cir. 2023).

We thus turn to whether any harm to the Basin fish populations is traceable to BPA's challenged actions and whether these injuries would be redressed by a favorable decision in this case. Article III's causation requirement will not be satisfied by "a highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). But "[a]n injury is fairly traceable to a challenged action as long as the links in the proffered chain of causation are not hypothetical or tenuous and remain plausible." *Ass'n of Irritated Residents*, 10 F.4th at 943 (internal quotation marks and alterations omitted). This standard is "less demanding than proximate causation, and thus the 'causation chain does not fail solely because there are several links' or because a single third party's actions intervened." *O'Handley v. Weber*, 62 F.4th 1145, 1161 (9th Cir. 2023) (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011)). Applying these standards, we conclude that petitioners have sufficiently alleged that their injuries are fairly traceable to BPA's BP-22 ratemaking.

Our decision in *NEDC 1997* is relevant on this point. There, we considered whether environmental groups had standing—based on their interest in the Columbia River's anadromous fish populations—to claim that BPA had violated one of the very same legal obligations at issue in this case, § 4(h)(11)(A)(i)'s "equitable treatment" mandate. 117 F.3d at 1528–30. The petitioners alleged that BPA's duty to provide equitable treatment for fish and wildlife

required BPA to set aside certain portions of water (referred to as "non-Treaty storage") that were created by the construction of storage reservoirs in Canada and the United States. *Id.* at 1525. We observed that "[i]f the Northwest Power Act guarantees the fish a portion of the non-Treaty storage, it is clear that a denial of this great benefit would injure the fish; consequently, petitioners would be injured and they would have standing to sue." *Id.* at 1529–30. We therefore addressed the merits of the petitioners' claim, analyzed the scope of BPA's duty to provide equitable treatment, and concluded that this duty did not require BPA to dedicate a portion of the non-Treaty storage for fish. *Id.* at 1530–34.

Here, as in *NEDC 1997*, petitioners contend that BPA's alleged duties under § 4(h)(11)(A) required BPA to take steps which, if implemented, could reasonably be expected to benefit the Columbia River's anadromous fish populations. Specifically, petitioners argue that § 4(h)(11)(A) required BPA to assign additional funds for fish and wildlife when projecting its spending and, by extension, when setting its rates. "For standing purposes, we accept as valid the merits of [petitioners'] legal claims." *FEC v. Cruz*, 142 S. Ct. 1638, 1647 (2022); *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal."); *Iten v. County of Los Angeles*, --- F.4th ---, 2023 WL 5600292, at *4–5 (9th Cir. Aug. 30, 2023) (similar). And in this case, we think that requiring BPA to set projections and associated rates consistent with the duties in § 4(h)(11)(A) would plausibly benefit the Columbia River's fish populations through increased funding of mitigation projects. More particularly, if BPA were legally required to comply with two statutory duties

relating to environmental mitigation when making IPR projections and setting rates, it stands to reason that fish and wildlife would plausibly benefit, as they are the intended beneficiaries of these mitigation obligations.

BPA objects, however, that petitioners have taken aim at the wrong agency action. As noted above, BPA during the ratemaking process does not determine which projects to fund. Because "BPA's rate cases are about collecting dollars, not about spending dollars," BPA maintains that there is "no causal link" between its rate decisions and the alleged harm to fish and wildlife.

We do not think this point undermines petitioners' standing to sue. BPA's objection to standing ultimately takes issue with petitioners' merits theory that § 4(h)(11)(A) applies to ratemaking and requires BPA to devote more money to fish and wildlife. That petitioners' theory may fail on the merits does not mean petitioners lack standing to raise it. *See Cruz*, 142 S. Ct. at 1647; *Iten*, 2023 WL 5600292, at *8; *Barnum Timber Co. v. EPA*, 633 F.3d 894, 900 n.4 (9th Cir. 2011).

Petitioners also fairly point out that BPA has a past practice of adhering closely to the projected spending levels on which it bases its rate decisions. The record shows that, over the five-year period ending in 2020, BPA's spending on fish and wildlife programs closely tracked, and was as a practical matter hemmed in by, the projections BPA used in its ratemaking. This aligns with BPA's 2018–2023 Strategic Plan, which commits BPA to "set firm cost constraints at the start of the process . . . ." It is thus a "reasonable inference from the historical record," *Ass'n of Irritated Residents*, 10 F.4th at 944, that the BP-22 rate decisions will lead BPA to spend less on mitigation efforts than it would have if BPA

had to set projections and rates based on its environmental mitigation duties in § 4(h)(11)(A).

And because "Article III requires no more than *de facto* causality," *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (quotation omitted), petitioners' allegations about the persistent correlation between BPA's funding projections and BPA's actual spending can support Article III standing even if, strictly speaking, BPA's ratemaking did not make any final funding decisions.  At bottom, if BPA was bound by § 4(h)(11)(A) to set IPR projections and rates in a manner more cognizant of its environmental mitigation obligations, it is at least plausible, *see Ass'n of Irritated Residents*, 10 F.4th at 943, that rates set in accordance with those obligations would benefit fish and wildlife and thus the petitioners.  *See NEDC 1997*, 117 F.3d at 1529–30.

Our fine dissenting colleague concludes otherwise by relying heavily on *Department of Education v. Brown*, 143 S. Ct. 2343 (2023), a case decided after the parties filed their supplemental briefs on standing.  Contrary to the dissent, our decision here is consistent with *Brown*'s application of "customary traceability standards."  143 S. Ct. at 2354.  In *Brown*, the plaintiff borrowers challenged the Department of Education's authority to forgive student loans under the HEROES Act but acknowledged that the Department may have authority to do so under a different statute (the HEA). *Id.* at 2352.  They argued that if the Department had observed notice and comment procedures under the HEROES Act, it would have likely switched course and granted loan relief under HEA, and that that relief would have been more generous to the plaintiffs.  *Id.*

In the context of such an "unusual" claim, the Supreme Court found a lack of Article III standing because "[t]here is

little reason to think that [the Department's] discretionary decision to pursue one mechanism of loan relief has anything to do with its discretionary decision to pursue (or not pursue) another." *Id.* at 2352, 2354; *see also id.* at 2353 ("[T]he Department's decision to give *other* people relief under a *different statutory scheme* did not *cause* [plaintiffs] not to obtain the benefits they want."). Unlike the wholly independent statutes in *Brown*, *see id.* at 2353, BPA's spending decisions are made in light of its antecedent cost-projections and related ratemakings. BPA's obligations at issue here are logically and factually related in a way that the two alternative sources of authority for the Department's action in *Brown* were not. We thus do not think plaintiffs' theory is too attenuated for Article III standing purposes.

For largely the same reasons, petitioners have adequately alleged redressability. That requirement is satisfied if "it is likely, although not certain, that [the] injury can be redressed by a favorable decision." *Ass'n of Irritated Residents*, 10 F.4th at 944 (quoting *Wolfson v. Brammer*, 616 F.3d 1045, 1056 (9th Cir. 2010)); *see also Friends of the Earth*, 528 U.S. at 187 (finding that environmental-advocate plaintiffs sufficiently alleged redressability to seek civil penalties because those penalties, although paid to the government and not the plaintiffs, were sufficiently "likely" to "abat[e] current violations and prevent[] future ones"). "[F]ull redress" of the injury is not required, as "the ability 'to effectuate a partial remedy' satisfies the redressability requirement." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)).

Here, for purposes of the standing inquiry, we must assume that petitioners are correct that BPA was required to set rates based on its duties in § 4(h)(11)(A). *See Cruz*, 142

S. Ct. at 1647–48.  Under this assumption, it is "likely," even if "not certain," *see Ass'n of Irritated Residents*, 10 F.4th at 944 (quoting *Wolfson*, 616 F.3d at 1056), that BPA would provide additional funding for fish and wildlife mitigation efforts, especially given BPA's historical adherence to its projections.  It is, conversely, unlikely that, if required to follow § 4(h)(11)(A) in its ratemakings, BPA would set rates based on budget projections that take fish and wildlife needs into greater account, but then ignore those projections in its actual programming.  Again, it is "a reasonable inference from the historical record" that petitioners' injuries would be at least partially redressed by a favorable decision on the merits.  *Ass'n of Irritated Residents*, 10 F.4th at 944.

## III

Because petitioners have Article III standing, we turn to the merits.  Petitioners argue that BPA's ratemaking failed to comply with two obligations contained in NWPA § 4(h)(11)(A), which is codified at 16 U.S.C. § 839b(h)(11)(A).  The full text of that provision reads:

> (A) The [BPA] Administrator and other Federal agencies responsible for managing, operating, or regulating Federal or non-Federal hydroelectric facilities located on the Columbia River or its tributaries shall—
>
>> (i) exercise such responsibilities consistent with the purposes of this chapter and other applicable laws, to adequately protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, affected by such projects or facilities in a manner

that *provides equitable treatment for such fish and wildlife* with the other purposes for which such system and facilities are managed and operated;

(ii) exercise such responsibilities, *taking into account at each relevant stage of decisionmaking processes to the fullest extent practicable, the program adopted by the Council under this subsection.* If, and to the extent that, such other Federal agencies as a result of such consideration impose upon any non-Federal electric power project measures to protect, mitigate, and enhance fish and wildlife which are not attributable to the development and operation of such project, then the resulting monetary costs and power losses (if any) shall be borne by the Administrator in accordance with this subsection.

16 U.S.C. § 839b(h)(11)(A) (emphasis added).

Section 4(h)(11)(A) thus imposes two mandates: § 4(h)(11)(A)(i)'s obligation to provide "equitable treatment" for fish and wildlife, and § 4(h)(11)(A)(ii)'s requirement to "tak[e] into account" the Council's Program "at each relevant stage of decisionmaking processes to the fullest extent practicable." *See NEDC 1997*, 117 F.3d at 1531. Petitioners contend that these statutory obligations required BPA to set aside more funding for fish and wildlife mitigation efforts and to increase its rates so that it could provide that funding. BPA responds that § 4(h)(11)(A) does not apply to ratemaking at all. That is the central issue in

this case, and one that our precedents have not previously considered.

BPA's broadest argument is that § 4(h)(11)(A) does not extend to ratemaking because it refers to BPA "managing" and "operating" hydroelectric facilities. In BPA's view, this provision is limited to the management and operation of the hydroelectric facilities themselves, which would not include any off-site mitigation, much less ratemaking that funds off-site mitigation. We conclude it is unnecessary to reach this argument, and thus unnecessary to offer a fully definitive construction of § 4(h)(11)(A), because other aspects of the statutory scheme confirm that § 4(h)(11)(A) does not extend to ratemaking.

The text and structure of the NWPA as a whole convince us that § 4(h)(11)(A) does not apply to ratemaking. When interpreting a statutory provision, we consider not only its ordinary meaning, but also its place within the broader statutory scheme of which it is a part. *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). We must thus interpret § 4(h)(11)(A) within the "overall structure and design" of the statute that Congress enacted. *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1035 (9th Cir. 2022).

Here, § 4(h)(11)(A) does not mention ratemaking. Ratemaking is instead addressed—at length—in § 7 of the Act. *See* 16 U.S.C. § 839e. That section prescribes extensive requirements and procedures for BPA's ratemakings, many of them highly technical. *See Pac. Nw. Generating Co-op. v. Dep't of Energy*, 580 F.3d 792, 802

(9th Cir. 2009) (describing the "detailed statutory guidelines" governing ratemaking in § 7 of the NWPA); *APAC*, 126 F.3d at 1176 (explaining how "Section 7(i) prescribes specific procedures BPA must follow when establishing its rates"). It is § 7 that directs BPA to set rates "to recover, in accordance with sound business principles, the costs associated with the acquisition, conservation, and transmission of electric power . . . in the Federal Columbia River Power System." 16 U.S.C. § 839e(a)(1).

Nowhere in that exceedingly detailed section on ratemaking did Congress so much as acknowledge § 4(h)(11)(A), much less the significant obligations that it imposes when it applies. Petitioners offer no sound explanation as to why Congress would have enacted extensive provisions governing ratemaking in § 7, only to layer on major additional environmental mitigation-related requirements in a wholly separate provision that does not even discuss ratemaking. *See Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 321 (2014) ("[R]easonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'") (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997))). In this case, the NWPA simply does not "mandate the comprehensive, detailed mechanism that Petitioners seek BPA" to implement, and "we cannot impose this procedural requirement ourselves." *Confederated Tribes of the Umatilla Indian Reservation v. Bonneville Power Admin. (Confederated Tribes)*, 342 F.3d 924, 931 (9th Cir. 2003).

Other features of the statutory scheme buttress our conclusion that § 4(h)(11)(A) does not apply to ratemaking. In particular, § 7 requires BPA to consider various "equitable" considerations when promulgating rates, yet

says nothing about the "equitable treatment" mandate in § 4(h)(11)(A)(i). *See* 16 U.S.C. § 839b(h)(11)(A)(i). Perhaps most importantly for present purposes, § 7 requires BPA to "equitably allocate to power rates . . . all costs and benefits not otherwise allocated under this section, including, but not limited to" the costs of "conservation [and] fish and wildlife measures." *Id.* § 839e(g). And there are various other "equitable" requirements as well. Section 7 requires, for example, that BPA "equitably allocate the costs of the Federal transmission system between Federal and non-Federal power utilizing such system." *Id.* § 839e(a)(2)(C). BPA must further ensure that the rates for direct service industrial customers are "equitable in relation" to the rates charged to analogous customers. *Id.* § 839e(c)(1)(B). And BPA must establish power rates for customers outside the United States "which shall be equitable in relation to rates for all electric power which is, or may be, purchased . . . from entities outside the United States." *Id.* § 839e(*l*). In the face of so many express "equitable" requirements specifically applicable to ratemaking—including as to fish and wildlife in particular— it is much more probable to conclude that Congress did not impose at the ratemaking stage a further duty to provide "equitable treatment for such fish and wildlife," *id.* § 839b(h)(11)(A)(i), a duty that does not appear in § 7.

We encounter a similar problem with respect to § 4(h)(11)(A)(ii)'s requirement that BPA "tak[e] into account" the Council's Program "at each relevant stage of decisionmaking processes to the fullest extent practicable." *Id.* § 839b(h)(11)(A)(ii). Once again, given the reticulated nature of § 7 of the NWPA, there is no indication that Congress intended to subject BPA's ratemaking or antecedent IPR decisions to § 4(h)(11)(A)(ii). Indeed,

ratemaking and IPR do not even involve the determination of which specific programs to pursue, whether environmental mitigation programs or otherwise. *See Golden Northwest*, 501 F.3d at 1053.

Petitioners respond that § 7 of the NWPA states that BPA's rates "shall be established in accordance with . . . the provisions of this chapter," 16 U.S.C. § 839e(a)(1), which petitioners argue includes the *entire* NWPA, and therefore § 4(h)(11)(A). But this general cross-reference hardly establishes the stable connection to § 4(h)(11)(A) on which petitioners' argument depends. The general language referencing the entirety of the NWPA does not resolve *which* provisions of the NWPA a ratemaking must be "in accordance with." And a provision that does not pertain to ratemaking is not one to which ratemaking could be conducted "in accordance with" in the first place. In view of the text and structure of the NWPA as a whole, we do not think Congress meant to usher in potentially massive additional requirements to ratemaking through a generalized reference to the rest of the statute. That is especially so considering that § 7 does cross-reference various other specific provisions of the NWPA but does not do as to § 4(h)(11)(A).

In sum, if Congress wanted § 4(h)(11)(A) to apply to ratemaking and related budget projections—a significant legal obligation—it would have drafted the statute to say that. Because ratemaking is already specifically covered in detail by the NWPA and not mentioned in § 4(h)(11)(A), § 4(h)(11)(A) should not be read to apply to the ratemaking process itself. *See Pit River Tribe v. Bureau of Land Mgmt.*, 939 F.3d 962, 971 (9th Cir. 2019) ("When Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that

Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation and alteration omitted)).[2]

To be sure, and as we noted above, BPA must set its rates to recover its costs, including for fish and wildlife mitigation.    16 U.S.C. § 839e(a)(1); *see also Golden Northwest*, 501 F.3d at 1049.    But petitioners do not challenge BPA's rates on this basis.  This is not a case, like *Golden Northwest*, in which petitioners claim that BPA's rates fail substantial evidence review.  *See* 501 F.3d at 1051–53.  Petitioners' argument is that BPA was required to set its rates based on the two legal duties in NWPA § 4(h)(11)(A).  Because we conclude these duties do not apply to ratemaking, petitioners' challenge fails.

**PETITION DENIED.**

---

[2] Our past cases have stated that "[d]ue to the complex subject matter and BPA's factual and legal expertise, we give special, substantial deference to BPA's interpretation of the Northwest Power Act." *Confederated Tribes*, 342 F.3d at 928 (citations omitted).  Petitioners offer various arguments as to why that deference would nevertheless be unwarranted here.  We do not reach these arguments because we conclude that petitioners' reading of the NWPA is not correct.  We therefore have no need to defer to BPA, and no occasion to decide whether BPA might be due any deference in its interpretation.

BEA, Circuit Judge, dissenting:

While I am generally in accord with my colleagues' considered statutory interpretation analysis, I must respectfully dissent from their judgment because we simply lack subject matter jurisdiction over the petition for review. Idaho Conservation League, Great Old Broads for Wilderness, and Idaho Rivers United ("Petitioners") have not demonstrated that they have Article III standing to prosecute this suit.  They claim that Bonneville Power Administration's ("BPA") failure to set higher rates for fiscal years 2022 and 2023 will restrict the amount of additional funding that might otherwise be available for wildlife projects in the future.  Such restriction in funding will in turn thereby decrease the fish and wildlife populations in the Columbia River Basin, to the detriment of Petitioners' members who wish to observe such wildlife. But under our caselaw, this type of speculative chain of inferences is too attenuated for us to conclude that their alleged injury is 'fairly traceable' to (i.e., caused by) BPA's ratemaking decisions.

As a result, Petitioners lack standing.  And the majority's decision to reach the merits of this case is mistaken.  Instead, we are obligated to dismiss the petition for review for want of subject matter jurisdiction.

\*

Although BPA had not initially contested Petitioners' standing, we have an independent obligation to analyze the issue to assure ourselves that we have subject matter jurisdiction over the petition for review.  *Dep't of Educ. v. Brown*, 143 S. Ct. 2343, 2350–51 (2023).  There are three standing requirements Petitioners must meet for this court to

have the constitutional authority to resolve the case before
us.  Petitioners must demonstrate that they have suffered (1)
a concrete, particularized injury in fact that (2) is fairly
traceable to BPA's actions and that (3) can be redressed by
a judicial ruling in their favor.  *Nw. Envtl. Defense Ctr. v.
Bonneville Power Admin.* (*NEDC*), 117 F.3d 1520, 1528 (9th
Cir. 1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S.
555, 560 (1992)).    As explained below, Petitioners are
unable to satisfy the "fairly traceable" or "causation" prong
of the standing analysis.[1]

The  fairly  traceable  prong  of  the  standing  analysis
requires  Petitioners  to  "establish  a  'line  of  causation'

---

[1] In *TransUnion LLC v. Ramirez*, the Supreme Court altered the standing
analysis for the injury in fact element.  141 S. Ct. 2190, 2200 (2021) (A
party alleges a cognizable injury in fact if he can "identif[y] a close
historical or common-law analogue for [his] asserted injury.").  But
despite this sea change in the law of Standing, the Court notably did not
overrule *Lujan*'s holding "that the inability to 'observe an animal
species, even for purely esthetic purposes, . . . undeniably' is" an injury
in fact.  *See id.* at 2224 (Thomas, J., dissenting) (quoting *Lujan*, 504 U.S.
at 562).  As a result, despite the clear inconsistency between *Lujan*'s
holding that an esthetic injury constitutes an injury in fact and
*TransUnion*'s holding that such an injury must have a common law
analogue to be cognizable for standing purposes, I am bound by *Lujan*,
which is still good law.  *Rodriguez de Quijas v. Shearson/American
Express, Inc.*, 490 U.S 477, 484 (1989) ("If a precedent of this Court has
direct application in a case, yet appears to rest on reasons rejected in
some other line of decisions, the Court of Appeals should follow the case
which directly controls, leaving to this Court the prerogative of
overruling its own decisions.").  Namely, binding Supreme Court
precedent requires me to find that Petitioners have adequately alleged an
injury in fact: they fear that their ability to observe the fish and wildlife
populations in the Columbia River Basin will be more difficult as a result
of BPA's actions.   This, regardless whether the Common Law
recognized a right to observe fish and wildlife, or an analogue, as a
cognizable chose in action.

between [BPA's] action and their alleged harm that is more than 'attenuated.'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (quoting *Allen v. Wright*, 468 U.S. 737, 757 (1984)). Certainly, "a causation chain does not fail simply because it has several 'links.'" *Id.* (citation omitted). But causation is lacking when a litigant's "chain of contingencies . . . amounts to mere speculation" about what might occur, or when his chain of inferences requires a court to "guess[] as to how independent decisionmakers will exercise their judgment." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410–11 (2013).

The Supreme Court recently applied this analysis in *Department of Education v. Brown*. In *Brown*, two private litigants challenged the Biden Administration's decision to implement a student loan forgiveness plan under the Higher Education Relief Opportunities for Students Act of 2003 ("HEROES Act"), which statute the Administration had cited "to bypass [the] notice-and-comment procedures that the Administrative Procedure Act (APA) would otherwise demand." 143 S. Ct. at 2349–50. The private litigants argued that the student loan forgiveness plan was unlawful because the Administration was required to promulgate the plan under the Higher Education Act of 1965 ("HEA"), which required the Administration to comply with the APA by engaging in notice-and-comment rulemaking. *Id.* at 2350, 2352. The litigants claimed that such procedures were essential because had the Administration complied with the APA, the resulting student loan forgiveness plan might have been "more generous" than the plan the Administration had approved under the HEROES Act. *Id.* at 2352. The Supreme Court rejected this theory of standing as speculative and lacking the element of causation—the

alleged injury could not be fairly traced to the Department of Education's conduct. *Id.* at 2351. As the Court explained,

> [T]he Department's decision to give *other* people relief under a *different* statutory scheme did not cause respondents not to obtain the benefits they want. The cause of their supposed injury is far more pedestrian than that: The Department has simply *chosen* not to give them the relief they want. Ordinarily, a party's recourse to induce an agency to take a desired action is to file not a lawsuit, but a "petition for the issuance, amendment, or repeal of a rule." 5 U. S. C. § 553(e). The denial of such a petition "must be justified by a statement of reasons," which in turn "can be appealed to the courts" if the litigant has standing to maintain such a suit. *Auer v. Robbins*, 519 U. S. 452, 459 (1997). Contesting a separate benefits program based on a theory that it crowds out the desired one, however, is an approach for which we have been unable to find any precedent.
>
> It is true that in procedural-standing cases, we tolerate uncertainty over whether observing certain procedures would have led to (caused) a different substantive outcome, as with *Lujan*'s example of the dam and the bypassed environmental impact statement. *See* 504 U. S., at 572, n.7. In this case, however, the causal uncertainty is not merely over whether observing certain procedures would have led to a different *substantive* outcome. Instead,

> the uncertainty concerns whether the *substantive* decisions the Department has made regarding the Plan under the HEROES Act have a causal relationship with other substantive decisions respondents want the Department to make under the HEA. There is no precedent for tolerating this sort of causal uncertainty.

*Id.* at 2353–54.

Under this caselaw, when the litigant's theory of standing requires conjecture at each step of the inferential chain or speculation regarding how others will exercise their discretion to trace the asserted injury to the adverse party's complained of actions, the requirement of causation is not met and the litigant lacks Article III standing.

\*

Applying this caselaw to the case at bar compels the conclusion that Petitioners cannot establish that their alleged injury is fairly traceable to BPA's ratemaking decisions regarding what rates to set for fiscal years 2022 and 2023.

As we have previously recognized, BPA's rate cases are "not the for[a] for making decisions regarding which fish and wildlife [projects] to implement." *Golden Nw. Aluminum, Inc. v. Bonneville Power Admin.*, 501 F.3d 1037, 1053 (9th Cir. 2007). Petitioners readily acknowledge this fact. In their briefing, they concede that "BPA did not decide on funding levels for individual mitigation projects during the rate case" and that any projected spending levels BPA used during its rate case to predict the proper rates to set for electricity sales "[we]re not 'binding' or 'final.'" Petitioners instead argue that they have standing because BPA "*could*

have made a different decision about overall funding that would ultimately inure to the benefit of Petitioners."

This kind of speculation is wholly insufficient to establish causation. Petitioners do not provide any explanation as to how they can connect the BPA's changes to its "overall funding" to the benefits that will purportedly inure to the fish they want to nurture. To-wit, they fail to allege facts that plausibly establish that an increase in "overall funding" will result in programs that increase the fish and wildlife population. They repeatedly rely simply on a conclusory assertion that the harm to wildlife and BPA's actions are connected. But Petitioners' failure to state facts which plausibly demonstrate this conclusory assertion is fatal to their ability to demonstrate causation. *See NEDC*, 117 F.3d at 1528–29 (rejecting a theory of standing because the petitioners "submitt[ed] no evidence" to support their claim that BPA's actions would harm the fish populations).

But there is a more fundamental problem with Petitioners' arguments. That BPA may produce an increase in overall funding by setting higher rates does not mean the resulting excess funding will actually be earmarked for fish and wildlife projects. For example, an official tasked with deciding how to allocate BPA's revenue streams may exercise his independent judgment to use the excess revenue to protect BPA personnel salaries from an economic downturn or recession rather than to spend more money on fish and wildlife. Petitioners would have us accept their conclusory assertion that any increase in funding levels will necessarily be funneled to wildlife projects. But we are not required to predict how BPA officials will choose to exercise their discretion when deciding how to expend BPA's financial resources. *Clapper*, 568 U.S. at 410–411, 413.

That the chain of causation is highly attenuated is further bolstered by Petitioners' acknowledgement that BPA does not necessarily handle programmatic funding decisions once money is set aside for wildlife projects. In a declaration submitted with Petitioners' opening brief, the declarant declared that rather than execute a contract "for each [wildlife] project," "BPA submits the [earmarked] funds . . . as a conglomerate 'portfolio' of funds" for the designated environmental group to spend on environmental ventures. Stated differently, Petitioners' theory of causation depends not only on conjecture as to whether future revenues will be allocated as Petitioners wish. But it also depends on their assurance that a third-party environmental group that receives a "'portfolio' of funds" from BPA will exercise its independent judgment to spend that money in a manner that is consonant with Petitioners' pro-piscine goals. Because Petitioners ask us to engage in several layers of "guesswork as to how independent decisionmakers will exercise their judgment" to link their asserted esthetic injuries to BPA's ratemaking decisions, they have failed to show that any harm to the wildlife in the Columbia River Basin is fairly traceable to BPA's ratemaking decisions. *Id.* at 413.

Finally, even were the above insufficient to show why Petitioners do not have standing to prosecute this suit, there is no question that causation is lacking after the Supreme Court's decision in *Brown*. The majority disagrees, reasoning that, because there were two "wholly independent statutes in *Brown*," the HEROES Act and the HEA, BPA's ratemaking and funding obligations are "logically and factually related in a way that the two alternative sources of authority for the Department's action in *Brown* were not." The majority sees a difference but does not make a relevant distinction. In *Brown*, the Supreme Court's Article III

standing analysis did not depend on whether the HEROES Act and the HEA are "logically and factually related" to one another. Rather, the touchstone was the lack of a causal link between the discretionary decisions the Department made and other discretionary decisions the plaintiffs wanted the Department to make, under either and both Acts.

Here, too, no causal link exists. At its heart, Petitioners' case is based on the claim that BPA's actions under its ratemaking authority (i.e., purportedly setting rates too low) will lead BPA to exercise what Petitioners admit is its *independent* statutory authority to decide what projects to fund in a manner that would prevent Petitioners from obtaining their desired outcome: an increase in the fish and wildlife populations in the Columbia River Basin. But under *Brown*, because BPA does not allocate any funds during its rate case and because the projected costs BPA uses to set its rates are not legally binding (i.e., BPA can still incur additional wildlife obligations after rates are set), there is an insufficient causal connection between BPA's funding and ratemaking decisions to establish Article III standing. Petitioners merely speculate whether the "*substantive* decisions [BPA] has made regarding [its rates] . . . have a causal relationship [to] other *substantive* decisions [Petitioners] want [BPA] to make" when it exercises its *independent* statutory authority to allocate any funds that have accrued. *Brown*, 143 S. Ct. at 2354. As the Supreme Court held—in no uncertain terms—"[t]here is no precedent for tolerating this sort of causal uncertainty."[2] *Id.* True,

---

[2] Given the Supreme Court's holding in *Brown* is directly applicable to this case, our prior caselaw that had employed a more forgiving standard

for establishing causation in environmental suits does not govern our resolution of this petition for review.

For example, we had held that the Cottonwood Environmental Law Center had adequately alleged a procedural injury in its suit against the United States Forest Service ("USFS") because it contended that the USFS was required to consult with the United States Fish and Wildlife Service ("FWS") under the Endangered Species Act after the FWS designated stretches of National Forest land as a critical habitat for the Canada lynx. *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1077 (9th Cir. 2015). In *Cottonwood*, causation was satisfied because the harm the environmental group alleged implicating its members' ability to observe the Canada lynx was the USFS's failure to exercise its consultation authority to assess how its forest management projects might directly affect the lynx populations. *Id.* at 1081–82. But the claim in *Cottonwood* is not akin to Petitioners' challenge here. Rather than directly challenge BPA's funding decisions, Petitioners challenge BPA's ratemaking decision by speculating about how BPA may or may not exercise its independent statutory *allocation* authority at some time in the future. Reliance on one of BPA's statutory powers (its ratemaking authority) to bring an indirect challenge to BPA's exercise of another, independent statutory power (its allocation authority) is not analogous to *Cottonwood*, in which the petitioners challenged the USFS's decision not to consult with the FWS, which consultation could have had a more immediate and direct impact on the lynx populations.

Similarly, in *NEDC*, we held that the environmentalists had standing to challenge BPA's private agreements with electric utility companies regarding who owned the "rights to [the] water stored behind [the] hydroelectric dams on the Columbia River system." 117 F.3d at 1524. We found that the harm to the fish populations was fairly traceable to BPA's storage contracts because BPA's failure to permit wildlife groups to use these water storage reservoirs for spawning grounds directly impacted the claimed water rights of the fish. *Id.* at 1529–30. But the forgiving causation standard we applied in *NEDC* in which the challenged conduct was BPA's allocation of water in which the fish breathe does not govern this case in which BPA's rate case

*Brown* came down after all briefing in this case was in.  But it is the present law and we are bound by it.

*

The bottom line: Petitioners do not have standing to prosecute this suit.  They speculate that BPA's ratemaking decisions are causally connected to its allocation decisions— decisions that all agree are governed by different statutory provisions.  But to accept Petitioners' theory of standing is to engage in conjecture as to how different actors in the causal chain will exercise their independent judgments.  Rather than accept this highly attenuated theory of causation as the majority does, I would simply dismiss the petition for review for want of subject matter jurisdiction.

I respectfully dissent.

---

could raise money that may or may not be allocated to fish, fowl, or even personnel.

Regardless how we look at the issue, Petitioners' theory of causation requires us to speculate about how BPA will exercise its independent statutory allocation authority to connect the alleged wildlife-related injury to BPA's rate setting.  This kind of speculation does not permit us to find that Petitioners have standing to prosecute this suit.  *Brown*, 143 S. Ct. at 2354; *Clapper*, 568 U.S. at 410–411, 413.